UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| M-J-M-A-, and VICTOR C.G.,[1] *individually and on behalf of all similarly situated individuals*, | Case No. 6:25-cv-02011-MTK |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| LAURA HERMOSILLO, *Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations*; TODD LYONS, *Acting Director of Immigration and Customs Enforcement*; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; KRISTI NOEM, *Secretary of the Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; and PAMELA BONDI, *Attorney General of the United States*, | |
| Defendants. | |

**KASUBHAI,** United States District Judge:

In October of 2025, ICE and Customs and Border Protection (hereinafter collectively "ICE") officers from around the country reported to Oregon to execute what President Trump describes as "the single largest Mass Deportation Program in History." Cunnings Decl. Ex. 1, at

---

[1] The Court abbreviates Plaintiffs' full names in the interest of their safety. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000) (noting that "many federal courts, including the Ninth Circuit, have permitted parties to proceed anonymously when special circumstances justify secrecy"). Defendants are aware of their full names.

1, ECF No. 64-1. ICE officers are casting dragnets over Oregon towns they believe to be home to agricultural workers, calling them "target rich." Landing in those communities, officers surveil apartment complexes in the early morning hours, scan license plates for details about the vehicles' owners, and wait for them to get into their vehicles. Officers then stop, arrest, detain and transport people out of the District of Oregon to the Northwest ICE Processing Center ("NWIPC"), 144 miles away in Tacoma, Washington, before ultimately deporting them. Sworn testimony and substantial evidence before this Court show that ICE officers ask few questions and allow little time before shattering windows, handcuffing people, and detaining them at an ICE facility in another state.

The law on this issue is clear and undisputed. An ICE officer may arrest someone if the officer obtains in advance a warrant for their arrest. If the officer does not have a warrant, they cannot arrest someone unless they have probable cause to believe that **both** (1) the individual is in the United States unlawfully *and* (2) they are "likely to escape before a warrant can be obtained." 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii). Courts have found that the "likely to escape" question looks to "the totality of the circumstances known to the officer before making the arrest," including whether the officer can determine the individual's identity, previous escape attempts, and community ties such as family, a home, or a job. *See Ramirez Ovando v. Noem*, No. 25-3183, 2025 WL 3293467, at *3 (D. Colo. Nov. 25, 2025) (describing policy); Cunnings Decl. Ex. 17, ECF No. 64-17. Further, an arrest must be based on information known to the officers at the time of arrest and particular to the person to be arrested. An arrest cannot be justified after the fact.

Plaintiffs challenge ICE's practice of abusing its arrest power by failing to meet those criteria before arresting, detaining, and deporting people. Defendants do not—and could not—

argue that this practice is lawful. Rather, they argue that there is no such practice, and that the myriad cases presented to this Court are mere coincidence.

For the reasons discussed below, Plaintiffs' motion to preliminarily enjoin ICE's practice of arresting people without a warrant and without making a probable cause determination of that person's likelihood of escape is GRANTED. Plaintiffs are likely to succeed in proving ICE's unlawful practice has harmed many Oregon residents and will continue to do so absent intervention by this Court.

## PROCEDURAL BACKGROUND

On October 30, 2025, after ICE officers arrested and detained Plaintiff M-J-M-A-, she filed a Petition for Writ of Habeas Corpus to challenge her arrest and detention. Pet. Habeas Corpus, ECF No. 1. The next day, she moved for a temporary restraining order providing for her release. Pet'r's Mot. TRO, ECF No. 14. Hours later, Defendants released M-J-M-A- without explanation and without an order of supervision or further conditions. Pet'r's Status Report, ECF No. 18. Defendants have never explained why they released M-J-M-A-, and instead invoked attorney-client privilege when the Court asked for an explanation.

The Court held an evidentiary hearing on the Petition on December 2–3, 2025. The Court received twenty exhibits, including documentation of M-J-M-A-'s arrest and an arresting officer's body-worn camera footage. Plaintiff M-J-M-A-, attorney Kelsey Provo, and nine federal officers testified as to ICE's practices and M-J-M-A-'s stop, arrest, and detention. Each witness was subject to examination, cross-examination, and examination by the Court. The Petition remains pending as briefing continues.[2]

---

[2] The parties are still briefing the specific issue of M-J-M-A-'s arrest and ask the Court to abstain from ruling on its legality at this stage so that they may argue that issue in full. The Court will do so to ensure it has the benefit of complete and thorough briefing on that issue.

On January 9, 2026, M-J-M-A- moved to supplement the pleadings. Pet'r's Mot. Supplement, ECF No. 59. The Court granted that motion. Order, ECF No. 67. The Supplemental Complaint added Plaintiff Victor C.G. as a party and alleged that he was also arrested pursuant to Defendants' unlawful arrest and detention practice. Supplemental Pleading, ECF No. 68. Plaintiffs cited "the experiences of numerous Oregon community members" to claim that "Defendants' agents are systematically making immigration arrests without a warrant and without probable cause findings as to immigration status and flight risk[3] as required under federal immigration law." *Id.* at 11-14.

Plaintiffs also moved to certify a class and a subclass: first, a "Warrantless Arrest Class" consisting of "[a]ll person[s] since September 28, 2025, who have been arrested or will be arrested in the District of Oregon for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk"; and second, an "Unassessed Escape Risk Subclass," consisting of "[a]ll person[s] since September 28, 2025, who have been arrested or will be arrested in the District of Oregon for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk."[4] Pls.' Mot. Class Cert. 1, ECF No. 60. Complete briefing on that motion is pending.

Finally, Plaintiffs moved for a preliminary injunction and for provisional certification of the Unassessed Escape Risk Subclass. Plaintiffs seek an injunction prohibiting Defendants from

---

[3] At times, counsel in this case and courts in other cases sometimes use "flight risk" interchangeably with "escape risk," and the Court understands those terms to refer to the "likely to escape" requirement in 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii). The Court will use the legal term of art "likely to escape."

[4] Plaintiffs clarify in their Motion for Preliminary Injunction that the Unassessed Escape Risk Class should consist of those who were arrested without an assessment "that the person poses an *escape* risk." Pls.' Mot. 27 (emphasis added).

conducting warrantless civil immigration arrests without first making an individualized probable cause determination of potential arrestees' risk of escape, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii). Defendants oppose that motion and contend that Plaintiffs lack standing and fail to establish a likelihood of success on the merits. Defs.' Resp., ECF No. 70.

The Court heard oral argument on the Motions for Preliminary Injunction and Provisional Certification of the Unassessed Escape Risk Subclass on February 4, 2026. ECF No. 80. The Court received four additional exhibits, including three videos that supported Plaintiffs' allegations of warrantless arrest practices. Plaintiff C.G. testified in addition to the authors of the three videos. ECF No. 78. The Court also has before it several declarations made in the course of this case, including the Declaration of M-J-M-A-, ECF No. 31; the Declaration of Victor C.G., ECF No. 62; the Declaration of Juana A., ECF No. 63; the Declaration of Jordan E. Cunnings, ECF No. 64, and the 37 exhibits attached thereto; and the Declaration of Stephen W. Manning, ECF No. 76.

## FACTUAL BACKGROUND

To serve the President's demands for 3,000 immigration arrests each day nationally, evidence shows that ICE officers deployed to Oregon communities and arrested an "extraordinary" number of Oregonians in October of 2025 with little regard for conducting lawful arrests. Rebecca Santana, *ICE, the agency central to Trump's mass deportation plans, undergoes a shakeup*, Associated Press (May 30, 2025), *available at* https://perma.cc/3RL3-Y9ZU (last visited Feb. 27, 2026) ("White House deputy chief of staff Stephen Miller said on Fox News earlier this week that the administration was setting a goal of 3,000 arrests by ICE each day and that the number could go higher."); Cunnings Decl. Ex. 10, at 7, ECF No. 64-10. In October of 2025, civil immigration arrests in Oregon rose 1,400% over previous months, and

7,900% over the prior year. *Id.* One source reported that "more than 300 people across Oregon were detained in October." Cunnings Decl. Ex. 11, at 2, ECF No. 64-11. U.S. Border Patrol Chief Michael W. Banks publicly stated that "[i]n October alone, over 560 criminal illegal aliens living in our neighborhoods were targeted and apprehended" in Portland, Oregon, and assured that "[they]'re not done yet!" Chief Michael W. Banks (@USBPChief), X (Nov. 14, 2025 at 5:07 PM), *available at* https://perma.cc/34TS-5UUW. On October 30, 2025, the day Plaintiff M-J-M-A- was arrested, at least thirty-five others were arrested in the same town. Cunnings Decl. Ex. 11, at 2. In November of 2025, ICE officers arrested twenty-six people in Salem and fifteen in Lane County. Cunnings Decl. Exs. 12-13, ECF Nos. 64-12, 64-13.

ICE officers traveled to Portland, Oregon from their usual duty stations in Arizona, California, Colorado, Minnesota, and Nebraska. Tr.[5] 121-23, 169-70, 221, 271-72 (ECF No. 56),[6] 339-40, 387-88, 419-20. The officers were "asked," "directed," or "volun-told" to come to Oregon "[t]o assist with street arrests" and conduct "at-large enforcement"—"finding, locating, and targeting people that are undocumented here in the Portland, Oregon, or Washington area." Tr. 122, 221-22, 272 (ECF No. 56). Enforcement operations in Oregon during this time were variously called "Operation Fortifying the Border," "Operation Black Rose," "Operation Portland Safe," and "Operation Portland Sweep." Tr. 134, 200, 330, 347.

On October 30, 2025, around 4:45am, ICE officers identified as members of "Team 7" targeted Woodburn, Oregon for their first operation of the day. Tr. 123, 125. Five enforcement

---

[5] The Transcripts of Court Proceedings are available for the December 2–3, 2025 evidentiary hearing. ECF Nos. 55–57. This Opinion cites to those documents by reference to the Transcript page numbers ("Tr.").

[6] Due to an apparent administrative oversight, the Transcript page numbers in ECF Nos. 55-57 overlap and there are multiple pages numbered 259-296. Accordingly, when the Court cites to any pages within Tr. 259-96, it specifies the ECF document where those cites are found.

officers were split between "three or four" vehicles. Tr. 126. Officers were aware that the area

was home to "agricultural workers and manual laborers" and were advised in advance that

Woodburn is "a large area for agricultural work." Tr. 146, 176. In the officers' training and

experience, undocumented people do agricultural work "to get by." Tr. 147, 178.

 "[I]ntelligence from the field office" and target packages directed the officers'

enforcement activities that day. Tr. 123. The targets given to officers can be individuals or more

broadly, a particular geographic location. Tr. 391-92. Target packages "can be as simple as a

name and an address." Tr. 124. Officers use "a newer app" called Elite, described as "basically a

map of the United States[,] . . . kind of like Google Maps" to plot and locate individuals who

have what officers called an "immigration nexus." Tr. 228-29. An immigration nexus refers

broadly to "some sort of connection between immigration law . . . and where [officers] may find

those subjects or those targets." Tr. 124-25. That information could come through someone

"listing this address through court records or something[.]" Tr. 228. Although the officers, using

the Elite app, target individuals who have immigration nexuses, testimony revealed that the term

merely refers to someone who "had some sort of interaction with an immigration official or an

immigration agency in the past." Tr. 130. People "who immigrated to the United States and

naturalized," or are otherwise here lawfully, also have an immigration nexus and can be targeted.

Tr. 130-32, 164-65. Elite app leads also are, "generally speaking," "not accurate." Tr. 230-31.

 "[I]ntelligence passed down from the [Portland] field office" led the officers to a

particular Woodburn apartment complex, Team 7's first investigative stop that day. Tr. 123-27.

Members of Team 7 communicated by conference call and through a group text thread, where

one officer advised the others that a certain apartment complex was "target rich." Tr. 129, 164;

Pet'r's Exs. Nos. 102, 105, 106, ECF No. 46. Officers understood that to mean that another

officer had "identified several vehicles with registered owners who had either a criminal or immigration nexus." Tr. 164-65, 412-13.

At the apartment complex, officers relayed license plate numbers at random to another officer who ran the numbers through a computer database. Tr. 126-27, 413-14. The purpose of running license plates was "[t]o try to tie a vehicle to the potential target." Tr. 127-28. Officers "needed to try to identify a vehicle in order for [them] to follow the target[.]" Tr. 128.

"[A]round 5:30 that morning," an officer saw a man come out from the apartment complex and get into a white van, so he asked another officer to run the van's plate. Tr. 129-30, 235-36. The resulting registered owner's name was on the officer's target list, and officers believed the registered owner was in the country unlawfully because there was a history of his voluntary return and no documented entry in the United States. Tr. 236-37. The registered owner's "rap sheet" also "said Mexico on it," and the testifying officer suggested, but could not recall, that the vehicle's owner may have had an assault charge or conviction. Tr. 237. No weight is given to this unsupported testimony because the witness destroyed the "rap sheet" and other documents relating to the mission that morning. Officers "were planning on stopping the van, but the team wasn't ready at the time." Tr. 243. An officer followed the van "until the rest of the team could catch up to [him]," during which time the van stopped three more times to pick up passengers. Tr. 238.

## I.     Warrantless Arrest of M-J-M-A-

Plaintiff M-J-M-A-, originally from Mexico, is an Oregon resident who came to the United States in January of 2025. M-J-M-A- Decl. ¶¶ 2-4. She shares a home and works with her son and nephew here. *Id.* ¶¶ 4-5. At the evidentiary hearing, she affirmed as true her declaration on file with the Court. Tr. 87-88.

M-J-M-A-, her son, and nephew entered the van and were carpooling on their way to work. M-J-M-A- Decl. ¶ 5; Tr. 79. Contrary to the officers' knowledge that they were targeting an agricultural area because it was "target rich," an officer testified that "whenever you're picking up other individuals that early in the morning, it's — it's either human smuggling or human trafficking, . . . or it could be just you harboring people that are here illegally in the United States." Tr. 238. The officer's concerns of human smuggling are unfounded. There is no evidence in this record that any officers, while in Oregon, ever investigated or found evidence of human smuggling. Rather, the overwhelming evidence in this record confirms that ICE officers targeted Woodburn and other cities in Oregon because of the large number of agricultural workers living in those areas. Officer testimony regarding human smuggling serves only as an inappropriate pretextual reason for developing reasonable suspicion for a stop. That officer also testified that he believed the van was suspicious because it had tinted windows and did not have any commercial markings. Tr. 240-41. When asked what gave the officers "reasonable suspicion that there may have been a crime afoot or that the folks in the van may not have had legal status," the officer noted that the registered owner of the van had an immigration history, and that "[p]eople are being — going into a van early in the morning." Tr. 242. The officers did not have the identities of anyone in the van and they were not pursuing any known targets. Tr. 204. The officers did not have a warrant for M-J-M-A-'s arrest. Tr. 204.

Once the officers were "set up," an officer activated his vehicle's lights and sirens to pull the van over. Tr. 244. An officer took to "a walking position . . . in front of the vehicle" as two other officers approached either side of the vehicle. Tr. 244. Another vehicle parked in front of the van. Tr. 203. Officers testified they ordered the driver "multiple times" to roll down the window, in English and Spanish. Tr. 245-46. Officers described the driver as "noncompliant,"

but only "a couple of seconds" passed between the first order to roll down the window and an officer shattering the driver-side window. Tr. 179, 185, 246. The Court viewed video evidence of the stop. The Court finds that the officer did not provide any meaningfully reasonable time for the driver to comply with his commands before shattering the driver side window.

An officer then "introduced [himself] as immigration, and [he] asked [the passengers] if they had any credentials on them." Tr. 185. "[T]he officers opened all the doors and started screaming at [them] to get out." M-J-M-A- Decl. ¶ 6. As soon as officers shattered the window and opened the passenger doors of the van, an officer identified the driver as a "15," or an "arrestee." Tr. 179-80. The driver was arrested "[f]or not having status in the United States[.]" Tr. 182. That "raised [one officer's] suspicion to believe that the other subjects in the van could possibly be illegal as well." Tr. 182.

The officers' faces were masked and M-J-M-A- did not hear the officers identify themselves. M-J-M-A- Decl. ¶ 7; Tr. 81-83. She attempted to call 9-1-1 because she thought the police might help her. Tr. 81-82. M-J-M-A- was "paralyzed" with fright and "did not understand what was happening." M-J-M-A- Decl. ¶ 7. Officers testified that they told the passengers to show them their hands, but they did not comply. Tr. 185-86. But all seven passengers complied in "less than five minutes." Tr. 191, 249. M-J-M-A- initially "refused to get out of the vehicle," and two officers "assist[ed] her out of the vehicle." Tr. 192. Officers grabbed M-J-M-A-'s arm and pulled her out of the van. M-J-M-A- Decl. ¶ 8.

Officers pulled people out of the van, immediately placed everyone in handcuffs "[f]or officer safety," and sat them along a nearby wall. Tr. 151; M-J-M-A- Decl. ¶ 10. They told M-J-M-A- to put her hands behind her back, but "[s]he wanted to keep staying on the phone. She was gripping the phone as hard as she could." Tr. 250. M-J-M-A- stated that an officer then took her

phone and "folded it over [her] fingers and broke [the phone]." M-J-M-A- Decl. ¶ 8. The officer who placed handcuffs on M-J-M-A- testified that "[he] think[s] she dropped [her phone] at some point because whenever [they] sat her down, she didn't have her phone anymore." Tr. 251.

M-J-M-A- "kept telling everyone to try to stay calm and to not answer any questions because [she] knew [they] had the right to remain silent." M-J-M-A- Decl. ¶ 9. An officer also heard M-J-M-A- invoke her right to an attorney and reported that to fellow officers. Tr. 206.

Officers began placing everyone in their patrol cars. Tr. 151-52, 251. As one officer was putting people in his vehicle, "the guy that was in [his] back driver seat jumped to the front and started—he was honking the horn because he was trying to escape." Tr. 251. At that same time, another arrestee took off running. Tr. 152, 252. Officers testified that those events appeared to be a "concerted effort to divide us, to divide the officers' attention, and create an opportunity for others to flee." Tr. 153-54, 252. However, no evidence shows that there was any such scheme or that M-J-M-A- attempted to flee at any time; she remained seated on the sidewalk. Tr. 195-96, 421-22. Also during that time, M-J-M-A- "saw one of the officers punch [her] nephew." M-J-M-A- Decl. ¶ 11.

### A.    Documentation of Arrests in the Field

During this detention, officers used a software application called Mobile Fortify "to identify individuals who have an immigration nexus . . . us[ing] facial recognition." Tr. 157-58. While seated against the wall, "[a] couple officers approached [M-J-M-A-] . . . [and] took [her] picture and then started to show [her] pictures of different people and asked [her] if any of them were [her]. [She] just replied that was not [her]." M-J-M-A- Decl. ¶ 10. An officer testified that "there was two possible hits for her identity." Tr. 253.

When ICE officers arrest someone in the field, they complete a "Record of Deportable/Inadmissible Alien," known as an "I-213," which acts as an "arrest record" or "field

interview form." Pet'r's Ex. 109; Tr. 234, 264 (ECF No. 55). The officers who prepare this document are not under oath. Tr. 234. An I-213 contains a narrative of the arrest and the basis for the officer's probable cause determination. Tr. 233, 266 (ECF No. 55). Sometimes officers draft a "scratch 213" in the field as well. Tr. 396-97. A scratch 213 provides spaces for officers to list "basic information" like name, country of citizenship, immigration status, and "[m]ethod of [l]ocation / [a]pprehension[.]" Tr. 395; Pet'r's Ex. 110. The scratch 213 form used for M-J-M-A-instructed officers to "SEND ENCOUNTER TO" an ICE email address. Pet'r's Ex. 110.

Officer J.B. handcuffed M-J-M-A- and signed her scratch 213. Tr. 265, 268 (both ECF No. 55). He testified that he arrested M-J-M-A- without a warrant "[b]ecause there was a high likelihood of escape" since she did not give her name and "there's no way to go locate this person again in the future." Tr. 254. That supposed pre-arrest determination was never documented, and no other evidence indicates that that determination occurred before M-J-M-A-'s arrest. Additionally, evidence shows that other passengers were similarly arrested despite providing identification. The Court therefore finds this testimony is not credible.

J.B. testified that arresting officers "give [their supervisor] a brief synopsis of what happened" during the arrest and supervisory officers fill out the narrative and contents of an I-213. Tr. 266-67 (ECF No. 55). In that synopsis, officers do not articulate any "reasonable suspicion[] for stopping the car," because "[the supervisor] already has the confidence in all of [the officers] that [they]'ve run [their] checks." Tr. 267 (ECF No. 55).

Supervisory officer R.F. arrived at the scene after the van was stopped and arresting officers "called out saying they had seven." Tr. 390, 393. At the scene of the stop, "a lot of people . . . from the public were starting to show up, so it was a safety aspect for . . . the officers and the people that were in [their] vehicles to . . .  get out of that location and rally to [their]

transportation location." Tr. 394. At that transportation location, transport vans "wait[ed] there to receive the folks who [officers] had taken into custody[.]" Tr. 198. R.F. was "trying to talk to people" there to generate "scratch 213s — so [they] [could] figure out more information while they were temporarily detained." Tr. 394.

Another officer used Mobile Fortify to again take a photo of M-J-M-A-, and "a similar person" came up, though the officer "wasn't sure if it was her or not." Tr. 430. Officers asked M-J-M-A- if the photo was of her and she did not respond. Tr. 431. An officer took another photo "and this time it came up to someone else," and M-J-M-A- again did not respond. Tr. 431. The officers knew nothing more than that M-J-M-A- "was a possible match" to people whose photos also existed in Mobile Fortify. Tr. 431-32. As noted, that data relies on immigration nexuses, which can be inaccurate and produce individuals who are here in accordance with immigration laws. Further, no image search can totally confirm a subject's identification; "nothing will give you 100 percent unless the subject is . . . fingerprinted." Tr. 432-33 ("So it's just an image…[a]nd you kind of have to look at the eyes and the nose and the mouth and the lips. But nothing will give you 100 percent unless the subject is—is fingerprinted.").

"[M]ore people [from the public] started to show up" at the transportation location, so R.F. claimed there was again "a safety aspect for everyone involved." Tr. 395. The officers needed the arrestees' information to fill out their scratch 213s, but the officers opted to "get the information once [they] g[o]t to the [Portland ICE] facility." Tr. 395. "The transport vans were full, so [Team 7] self-transported" their arrestees to the ICE office in Portland. Tr. 198-99, 396. Other testimony shows that ICE's standard practice "[a]fter an arrest is made" is that "either the arresting officers or possibly other officers, transport officers, would transport the subject to the [Portland ICE facility]." Tr. 272-73 (ECF No. 56).

**B.    Documentation at the Portland ICE Facility**

When individuals arrive at the Portland ICE facility, "they're brought in, patted down and searched." Tr. 341. The detainees are "screened and [their] property [is] managed." Tr. 273 (ECF No. 56). "The guys on the floor [receive] the scratch 213 and I-200 from the field team and then tak[e] fingerprints." Tr. 341. "[A] scratch 213, which would've been generated either by the arresting officers in the field, transport officers, or the initial officers that receive the subject in the building, would be generated." Tr. 273 (ECF No. 56). That information goes "in a packet" and a team "verif[ies] record checks and propose[s] a final disposition for the case." Tr. 341.

M-J-M-A- was placed in a small holding cell. M-J-M-A- Decl. ¶ 13. She was not allowed to make any phone calls. *Id.* She was soon taken out of her cell, fingerprinted, and given documents by an officer who oversaw her processing. *Id.* ¶ 14; Tr. 286-87 (ECF No. 57).

At the Portland ICE facility, officers from Team 7 "again started filling out the rest of the 213s for [their] arrests." Tr. 397. R.F. filled out M-J-M-A-'s scratch I-213, though J.B.'s signature, not R.F.'s, is on that form. Tr. 395-96; Pet'r's Ex. 110. R.F. also wrote the encounter narrative used for M-J-M-A-'s I-213 despite the fact that she was not present at the time M-J-M-A- was encountered. Tr. 398. R.F. got information as to the "description of the arrest" from J.B. and two other officers on the scene, but "[they] didn't have a whole lot of time at either location to talk about it." Tr. 397, 400. R.F. described M-J-M-A-'s encounter with ICE officers as follows:

> [M-J-M-A-] was referred to as subject identified as being in the country as overstaying her visa. Subject was encountered by [ICE] on October 30, 2025, in Woodburn, Oregon at 0535 as part of Operation Fortifying the Border. ICE officers walked up to the individual with clear markings and verbally identified themselves and did a consensual encounter. The subject proceeded to comply with commands and but [sic] would not give her ID or name. Subject was advised she was under arrest for immigration violations. After being fingerprinted subject was found to be a visa overstay.

Pet'r's Ex. 109, at 2. R.F. testified that she used "the same" narrative for everyone who was "detained in that same setting[.]" Tr. 401. As described above, that narrative does not accurately reflect what happened—R.F. admitted that the traffic stop was not consensual and stated that she would have corrected her mistake if she had known about it. Tr. 402-03.

Officer B.W. processed M-J-M-A-, "personally interview[ed] her," and generated her I-213 form. Tr. 275, 280 (both ECF No. 56). B.W. did not know anything about M-J-M-A-'s arrest except "that which would've been handwritten on the scratch 213." Tr. 279 (ECF No. 56). As noted, the scratch 213 contains only basic information such as name, country of origin, and immigration status. B.W. stated that he is "fluent" in Spanish. Tr. 285, 288 (both ECF No. 56). M-J-M-A- does not speak English. Tr. 85. No interpreter was present. Pet'r's Ex. 108.

B.W. provided an "I-826" to M-J-M-A- in Spanish. Tr. 286-87 (ECF No. 56); Pet'r's Ex. 108. An I-826 contains "an advisal of rights and notifications," asks an individual to "select their preference for proceeding through immigration proceedings," and allows the processing officer to "certify that [they] served the individual." Tr. 288-89 (ECF No. 56). Detainees can select one of three options: (1) take their case in front of an immigration judge; (2) claim fear of removal and seek asylum status; or (3) renounce their right to immigration proceedings and agree to be detained until they voluntarily return to their country of origin. Tr. 289-90 (ECF No. 56); Pet'r's Ex. 108.

B.W. testified that, when processing, he "ask[s] if the subject can read and understand Spanish," asks them to read the form, and then "ask[s] them if they understand it." Tr. 290 (ECF No. 56). "Almost always clarification or another explanation is needed" for this important decision. Tr. 290-91 (ECF No. 56). B.W. "must have reread it to her, [he] assum[ed] because she had questions or needed further explanation," which he would have given. Tr. 291 (ECF No. 56).

M-J-M-A- "reviewed and made selections on" that form, but "primarily from [B.W.'s] interview, she requested to be returned . . . to be detained for as small amount of time as possible." Tr. 287 (ECF No. 56).

B.W. testified under oath that he speaks Spanish fluently, and no interpreter was present during his explanation to M-J-M-A- of her right to immigration proceedings. At the evidentiary hearing, however, when asked to do so, B.W. was unable to translate lines from the form that he claimed to have discussed with and explained to M-J-M-A-. Tr. 302. B.W. paused several times and appeared uncomfortable while attempting to translate the document. He was unable to recognize the future tense in Spanish as used on the form and embarrassingly admitted in court that "the English would be helpful[.]" Tr. 302. That evidence raises significant doubts about the quality and depth of communications between B.W. and M-J-M-A- as she considered her due process rights and made vital decisions on her I-826.

Officer B.W. also did not tell M-J-M-A- about the eligibility grounds for asylum or the grounds for withholding removal, though he wrote that M-J-M-A- "claims no fear of returning to Mexico" and "requests to be returned to Mexico as soon as possible." Tr. 286 (ECF No. 56), 298-99. For her part, M-J-M-A- testified that an "ICE agent . . . forced [her] to sign a document, but [she did] not know what that was. Eventually, the agent told [her] that if [she] did not agree to be removed voluntarily, then it would take a very long time for [her] to leave." M-J-M-A- Decl. ¶ 14. This Court finds that M-J-M-A's testimony and declaration describing her experience in the Portland ICE facility is the most credible and accurate testimony about what happened to her in that facility.

B.W. also testified that he "received [two paragraphs] from a supervisor and was instructed to copy and paste those in on the narratives that [they] processed" as to the "Record of Deportable / Excludable Alien" on I-213s. Tr. 276 (ECF No. 56). The full text follows:

> The subject has displayed a blatant disregard for U.S. immigration law and the legal entry process. The individual's unauthorized entry into the United States constitutes a violation of the Immigration and Nationality Act (INA) and undermines the integrity of the nation's lawful immigration system. This conduct also presents a potential national security and public safety concern, as the President of the United States, through Proclamation 9844 (February 15, 2019), declared a National Emergency concerning the security of the southern border of the United States. The proclamation states that unlawful migration across U.S. borders constitutes a national emergency that threatens core national interests and endangers the safety of the American public.
> Unlawful entries of this nature directly challenge the United States Government's ability to secure its borders and protect the homeland from foreign terrorists, transnational criminal organizations, and other threats to national security and public safety. The subject's actions contribute to these ongoing national concerns and reflect a disregard for the immigration laws of the United States.

Pet'r's Ex. 109, at 2. B.W. testified that, as instructed, he pasted those stock paragraphs into every narrative he drafted during his one-month tenure at the Portland ICE facility. Tr. 272, 275-78 (both ECF No. 56). That passage was "unique to [his] time in Portland." Tr. 277 (ECF No. 56). ICE supervisors often instruct similar behavior: "it would not have been unusual for any one of the supervisors to have said 'Include this language in the narrative[.]'" Tr. 278 (ECF No. 56). Officers generally "follow a template for the narrative so that [they] cover all appropriate legal bases, so that the narrative is complete." Tr. 278 (ECF No. 56). "The rest of the sections . . . are a form of template that are changed and specified to be accurate for the person to whom it refers." Tr. 278 (ECF No. 56).

As to M-J-M-A-'s circumstances, that boilerplate "narrative" was incorrect. M-J-M-A-did not enter the U.S. unlawfully; as also noted on the I-213, M-J-M-A- entered the United States "on January 19, 2025 with a B2 visa [valid] through March 21, 2025." Pet'r's Ex. 109, at 2. B.W. testified that there were "mistakes" in his report, and that those two paragraphs "could have been

rewritten to more accurately reflect [M-J-M-A-'s] immigration status." Tr. 274-75 (ECF No. 57).

He further stated that the I-213 "could have been more complete. There could've been more data

entered, further record checks made, *Miranda* warning given, criminal questions asked. . . .

However, when [he] signed it, there were no blatant factual errors; and it was true and correct to

the best of [his] ability under the circumstances, which were rushed. . ." Tr. 292 (ECF No. 57).

He ultimately confessed, "[I] could've done better[.]" Tr. 292 (ECF No. 57).

The ICE supervisor who reviewed M-J-M-A-'s I-213, officer K.K., testified that "[he]

was just making sure [officers] put in pertinent information and that [they] had probable cause

that the petitioner was removable or amenable to removal proceedings." Tr. 343. K.K. testified

that to determine whether M-J-M-A- was subject to removal, "[he] looked at the fact that she

was admitted to the United States and overstayed her visa." Tr. 343.

In her final moments in Oregon before being transported to Tacoma, M-J-M-A- again

asked to speak with an attorney at the Portland ICE facility. M-J-M-A- Decl. ¶ 14. She was taken

into a small room to meet with an attorney. *Id.* ¶ 15.

According to officer testimony, "every day there are usually two runs" of either vans or

buses from the Portland ICE facility to the NWIPC in Tacoma, Washington. Tr. 374. "[M]ales

and females need to be separated," so officers must ensure appropriate ratios of male and female

passengers. Tr. 375. An officer claimed that the private transport company's drivers have

commercial driver's licenses, so "[t]here's certain Department of Transportation rules they have

to follow. There's also . . . rules regarding the contract with ICE about how many hours they can

work, how many miles they can drive, stuff like that." Tr. 376. This means that "on a busy day

especially, but any day . . . they need to get the—whatever bodies, whatever files are ready, they

need to get them out, whichever ratio fits at that point." Tr. 376. Pursuant to that practice, after

only a few minutes, M-J-M-A-'s meeting with her attorneys was cut short so that ICE could

transport her to the NWIPC because her "file was one of the ones that was ready." *Id.* ¶¶ 15-17;

Tr. 377.

### C. M-J-M-A's Return to Oregon

The next morning in Tacoma, Defendants released M-J-M-A- without explanation and

left her to find her own way back home to Oregon. *Id.* ¶¶ 19-20. As stated in M-J-M-A-'s

declaration,

> . . . [A]n officer called me and told me to get my stuff because I was going to leave.
> I thought I was being transferred to another detention center. . . . The officer took
> me to another room to change into my original clothes. After I was done, an ICE
> officer came to get me and that is when I found out I was being released. She asked
> if I had someone to pick me up, and I said no. She said that if I did not have a ride,
> they would just leave me alone on the street. This terrified me because I have never
> been Tacoma and I did not have a phone or any money with me. Luckily, I was able
> to get a ride home with someone else who was visiting a family member at the
> detention center that day. I have now returned home but I am still afraid that ICE
> will come and arrest me again. They have done it once without a reason, so I fear
> they will do it again. I feel it was only luck that I was able to meet with the attorneys
> for a few minutes before I was taken from Portland, and that is the only reason I am
> here and not deported or in a detention center somewhere else in the country. I
> know some of the other people who were detained at the same time as me, have
> already been deported or transferred to detention centers in other states.

*Id.* at ¶¶ 19-21.

## II. Warrantless Arrest of Victor C.G.

Plaintiff Victor C.G., originally from Mexico, has been living in the United States since

1999 and shares a home with his wife in Hillsboro, Oregon. C.G. Decl. ¶¶ 2-4. He lives near his

three adult children and four grandchildren and enjoys spending time with them. *Id.* ¶ 4. In May

of 2025, Plaintiff C.G. and his wife received bona fide determinations and deferred action on

their U visa applications. *Id.* ¶ 8. C.G. and his wife also received work permits. *Id.*

On October 14, 2025, Plaintiff C.G. was returning home from work when he was pulled

over by immigration officers. *Id.* ¶ 9. Three masked officers approached his vehicle and yelled

through his window asking if he was "Victor Cruz." *Id.* After being taken out of his truck, C.G. handed the officers his driver's license and work permit. *Id.* An officer "looked at it and said it meant nothing to them, that [he] was still 'an illegal.'" *Id.* C.G. testified that he was asked no further questions about his work permit, lawful status in the U.S., or pending visa. Feb. 4 Tr. 27-28, ECF No. 84. "The officers then handcuffed [him], chained [his] waist and ankles, and put [him] in an SUV." C.G. Decl. ¶ 9. C.G. was not presented with a warrant for his arrest. Feb. 4 Tr. 29.

Once he was placed in the officers' vehicle, one officer began showing the others a picture of a man on their phone, asking if the man in the photo was indeed Plaintiff C.G. Feb. 4 Tr. 28. According to C.G.'s testimony, the officers could not confirm that he was the man in the photo. Feb. 4 Tr. 32; C.G. Decl. ¶ 14. Plaintiff C.G. also saw the photo and confirmed that it was not him. Feb. 4 Tr. 28. As with M-J-M-A-, officers immediately transported him to the Portland, Oregon ICE facility. C.G. Decl. ¶ 14.

At the ICE facility, C.G. was processed and presented with documents to sign to agree to deportation. *Id.* "Although they confirmed [he] was not the person they had initially been looking for, one of the officers told [him] that because [he] was there [at the Portland ICE facility], they must take [him] to Tacoma." *Id.* C.G. overheard officers discussing what "they want[ed] to do with [him]," and one officer told another: "Do whatever you want. I don't want anything to do with this case." Feb. 4 Tr. 29. The officer responded: "Well, you're the one that arrested him. You have to tell me what you want done with him." Feb. 4 Tr. 29. Consistent with the evidence in M-J-M-A-'s case, an officer told C.G., "[b]ecause we've already got you here, we're just going to send you immediately to Tacoma." Feb. 4 Tr. 30. Shortly thereafter, Defendants transferred C.G. to the NWIPC. C.G. Decl. ¶ 15.

Plaintiff C.G. was detained for "about three weeks." *Id.* ¶ 17. He regularly communicated with his wife, who found an attorney to help him. Feb. 4 Tr. 34-35. About two weeks into his detention, C.G. was suddenly unable to make calls because his account access was denied. Feb. 4 Tr. 34. An officer told C.G. that "there were only two reasons" why that would happen: "they were going to move [him] to another state or . . . [he] was going to be deported." Feb. 4 Tr. 34.

C.G. used a friend's call time to update his wife and attorney. Feb. 4 Tr. 35. His attorney "placed a restraining order so that [ICE] wouldn't move [him]." Feb. 4 Tr. 35. Officers continued to request that C.G. sign a voluntary return agreement: "They were offering everyone a thousand dollars and their trip would be paid for." Feb. 4 Tr. 35. C.G. was released from detention about a week later, after his attorney "petition[ed] for [him] to be released through habeas corpus" and his family paid a $3,000 bond. Feb. 4 Tr. 36.

"After [he] was released, ICE place[d] an ankle monitor on [him] and gave [him] other reporting requirements." C.G. Decl. ¶ 17. He has since had the ankle monitor removed, but he is required to report both weekly and monthly and allow for regular home visits. *Id.* ¶ 18.

C.G. is "the wage earner in [his] family and [his] inability to work has impacted [them] greatly. . . [They] are afraid even to go to the grocery store." *Id.* C.G. testified that his family was terrified of opening the door to their home for weeks, and his grandchild was afraid to go to school. Feb. 4 Tr. 37. C.G. "ha[s] started seeing a therapist to help [him] manage the fear and anxiety this event has caused [him]. With the encouragement of [his] therapist, [he] left the house to do some small jobs." C.G. Decl. ¶ 19. His grandchild also "had to start mental health treatment following [C.G.'s] detention." *Id.* ¶ 20. C.G. is "still deeply afraid and constantly vigilant, constantly nervous. But [he] ha[s] to work despite the fear because [he] ha[s] to support

his family." *Id.* C.G. and his family "continue to hear about ICE activity in surrounding neighborhoods. [He] [does]n't want to live the same nightmare again." *Id.* ¶ 20.

## III.    Putative Class Members

Much of the evidence before the Court concerns named Plaintiffs M-J-M-A- and C.G., but Plaintiffs also include class action allegations of eight putative class members.

### A.    M-E-G-G-

M-E-G-G- is a 46-year-old resident of Washington County, and has lived in Cornelius, Oregon for over 20 years. Supplemental Pleading 11. M-E-G-G- is the mother of five children and the primary caretaker of her mother. *Id.* On November 21, 2025, M-E-G-G- was heading to work when several DHS vehicles stopped her and prevented her from driving away. *Id.* Officers arrested her without a warrant and without making an individualized flight risk determination. *Id.* at 11-12.

### B.    Fernando P.M.

Fernando P.M. has lived in the United States for approximately 21 years, paying taxes and staying active with family and his local community. *Id.* at 12. He was arrested by DHS officers without a warrant while they were looking for someone else. *Id.* In that case, the court found that DHS "followed an inverted process" by first arresting P.M. without a warrant and then "detaining [him] based on the events of their premature arrest." *Pichardo Medina v. Hermosilla*, No. 25-2233, 2025 WL 3712271, at *4 (D. Or. Dec. 22, 2025).

### C.    B.D.A.A.

B.D.A.A. has lived in the United States since 1992, and in December 2024, she received a bona fide determination for U-nonimmigrant status after being the victim of a serious crime. Supplemental Pleading 12. On November 5, 2025, B.D.A.A. was following traffic laws when

DHS officers stopped her and arrested her without a warrant. *Id.* According to the DHS officer who arrested her, B.D.A.A. was arrested because she had "bad luck." *Id.* None of the officers at the scene of the arrest documented reasons for the arrest, including the legally required flight risk determinations. *Id.*

### D.    R-G-S-

R-G-S- is a 27-year-old Oregon resident who intends to seek asylum in the United States and has resided here for more than a year. *Id.* While headed to work, R-G-S- was arrested and detained by DHS officers who made no pre-arrest individualized determination of R-G-S-'s flight risk. *Id.*

### E.    A-B-D-

A-B-D- is a 44-year-old farmworker who lives in the Willamette Valley and was arrested without a warrant by DHS officers on October 30, 2025. *Id.* He was detained despite years of residence in the United States without any criminal history. *Id.*

### F.    C-C-S-

C-C-S- is a 31-year-old farmworker who lives in the Willamette Valley who had resided with family in the United States for more than two years. *Id.* On October 30, 2025, DHS officers arrested and detained her without a warrant or probable cause for either her unlawful status in the country or her flight risk. *Id.*

### G.    L-A-R-A-

L-A-R-A- lives in Beaverton, Oregon with his partner of fifteen years. *Id.* On the morning of October 28, 2025, L-A-R-A- was stopped at a local supermarket after heading there to buy bread. *Id.* at 13-14. As he was leaving the store, masked DHS officers arrested L-A-R-A-

without a warrant and without any individualized determination of his immigration status or flight risk. *Id.* at 14.

### H.    L.A.E.

On September 23, 2025, L.A.E. was arrested by DHS officers who were looking for someone else. *Id.* L.A.E. was detained despite having lived in the United States since 1999, despite him having no criminal record, and despite the fact that the Ninth Circuit had granted a stay of his removal. *Id.*

### STANDARDS

"Generally, a party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) (citation omitted).

### DISCUSSION

The parties dispute (1) whether Plaintiffs have standing to seek injunctive relief; (2) whether the Court should provisionally certify Plaintiffs' "Unassessed Escape Risk Subclass"; and (3) whether the Court should prohibit ICE from arresting someone without making the required probable cause determination that the person is likely to escape before a warrant can be obtained, as set out in 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii). For the reasons discussed below, the Court finds that (1) Plaintiffs have standing; (2) provisional certification is warranted; and (3) a preliminary injunction is appropriate.

I.      **Legal Background**

A.      **Fourth Amendment and the INA**

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. CONST. amend. IV. This protection extends to citizens and non-citizens alike. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (noncitizens "receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country").

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (citation omitted). A seizure involves "physical force or a show of authority that in some way restrains the liberty of the person." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (quotation marks, alteration, and citation omitted). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Pursuant to the Fourth Amendment's prohibition on unreasonable seizures, law enforcement officers generally must have a warrant or probable cause before making an arrest. *Terry v. Ohio*, 392 U.S. 1, 20 (1968). "The warrant traditionally has represented an independent assurance that a search and arrest will not proceed without probable cause . . . Thus, an issuing [judge] must . . . be neutral and detached." *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972). "[T]he whole point of the basic rule . . . is that prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations." *Coolidge v. New Hampshire*, 403 U.S. 443, 449 (1971). Nonetheless, "consistent with the Fourth Amendment, immigration authorities may arrest individuals for civil immigration removal

purposes pursuant to an administrative arrest warrant issued by an executive official, rather than by a judge." *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 825 (9th Cir. 2020); 8 C.F.R. § 287.5(e)(2). Unlike judicial warrants, however, ICE training materials specifically state "'that administrative warrants do not authorize entry into a dwelling without consent.'" *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 983 (C.D. Cal. 2024).

Absent an administrative or judicial warrant, a "seizure of a person must be supported by probable cause *particularized with respect to that person*. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (emphasis added). Probable cause must also be established by "the facts known to the arresting officer at the time of the arrest"; an arrest may not be justified by facts learned after the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citation omitted). Absent probable cause, immigration officers "must have reasonable suspicion" to stop individuals and question them "about their citizenship and immigration status . . . [and] any further detention . . . must be based on . . . probable cause." *Brignoni-Ponce*, 422 U.S. at 881-82, 884 ("[T]he Fourth Amendment . . . forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens.").

To this end, the Immigration and Nationality Act ("INA") and its implementing regulations require immigration officers to obtain an arrest warrant before making an arrest for an immigration violation. 8 C.F.R. § 287.8(c)(2)(ii). Agents may make warrantless arrests as an exception to the warrant requirement only where the officer, prior to the arrest and with respect to the specific individual to be arrested, "has reason to believe that" the individual is both (1) "in the United States in violation of [immigration laws]" and (2) "likely to escape before a warrant

can be obtained[.]" 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii). The "reason to believe" requirement is the equivalent of "the constitutional requirement of probable cause." *Tejeda-Mata v. Immigr. Naturalization Serv.*, 626 F.2d 721, 725 (9th Cir. 1980).

Together, these standards mean that an immigration officer can know for *certain* that someone is present in violation of immigration laws, and *still* does not have authority to arrest them without a warrant or an individualized probable cause determination that the individual is "likely to escape before a warrant can be obtained." 8 C.F.R. § 287.8(c)(2)(ii).

### B.     Previous Settlement of Similar Dispute

ICE officers have been accused of abusing their warrantless arrest power for years and previously settled litigation looks eerily similar to that here. Unsurprisingly, these abuses spike when ICE shifts its focus from targeting specific individuals and instead conducts widespread sweeps targeting "collaterals." In May of 2018, ICE conducted "large-scale immigration sweeps" in Chicago, Illinois and arrested and detained over 100 people without a warrant. *Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 885 (N.D. Ill. 2020). Five of those individuals filed a putative class action under the Administrative Procedure Act ("APA") alleging that ICE was violating 8 U.S.C. § 1357(a)(2) by failing to make particularized determinations that they were "likely to escape before a warrant [could] be obtained" for their arrests. *Id.*

ICE settled that case in 2022 and issued a nationwide "Broadcast Statement of Policy," prescribing that "ICE officers are to conduct warrantless arrests in a manner that is consistent with 8 U.S.C. § 1357(a)(2)." *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 837-38 (N.D. Ill. 2025). The Broadcast Policy provided that:

> (1) to make a warrantless arrest, an ICE officer is required 'to have probable cause that an individual is in the United States in violation of U.S. immigration laws *and* probable cause that the individual is likely to escape before a warrant can be obtained for the arrest' (emphasis in original); (2) when determining 'likelihood of escape,' an officer 'must consider' the totality of the circumstances known to

> them before the arrest; (3) relevant factors include whether the officer can 'determine the individual's identity, knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances' weighing in favor or against flight risk; and (4) 'mere presence within the United States in violation of U.S. immigration law' is not, on its own, evidence of flight risk. . . .

*Ramirez Ovando*, 2025 WL 3293467, at *3; Cunnings Decl. Ex. 17. In other words, the Policy required ICE officers to follow the law.

The Broadcast Policy also required that ICE officers "document the facts and circumstances" of a warrantless arrest "as soon as practicable," including their findings of escape risk. Cunnings Decl. Ex 17, at 2. Information learned *after* a warrantless arrest was to be "documented separately from the information relevant to likelihood of escape known at the time of the warrantless arrest." *Id.*

Beginning in January of 2025, ICE was again alleged to have committed "repeated, material violations" against at least twenty-six class members by warrantlessly arresting them without a lawful escape risk determination. *Castañon Nava*, 806 F. Supp. 3d at 840. On October 22, 2025, ICE issued a new "Broadcast Statement of Policy" that extended the original agreement and remained in effect until February 2, 2026. *Ramirez-Ovando*, 2025 WL 3293467, at *4. In that policy, ICE again agreed to obey its statutory mandates to make individualized probable cause determinations as to an individual's escape risk before arresting them without a warrant.

### C.    Officials' Statements

Despite the INA's clear mandate and ICE's purported agreement to follow the law, high-ranking officials began making statements in 2025 that indicated an intent to revert to their unconstitutional and unlawful practices. To start, beginning in January of 2025, White House Deputy Chief of Staff Stephen Miller stated that the Trump Administration was "looking to set a

goal of a minimum of 3,000 arrests for ICE every day, and President Trump is going to keep pushing to get that number up higher each and every single day." Pet. Hab. Corp. ¶ 37; Cunnings Decl. Ex. 5 at 1, ECF No. 64-5. On June 15, 2025, President Trump posted on Truth Social that "ICE Officers are herewith ordered, by notice of this TRUTH, to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History." Cunnings Decl. Ex. 1, at 1. To achieve this, President Trump called for "expand[ed] efforts to detain and deport Illegal Aliens in America's largest Cities . . . ." *Id.* Former Chief Border Patrol Officer Gregory Bovino stated that the agency needs "reasonable suspicion to make an immigration arrest. . . . You notice I did not say probable cause, nor did I say I need a warrant." *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-3417, 2025 WL 3465518, at *2 (D.D.C. Dec. 2, 2025). Another DHS spokesperson stated that "DHS law enforcement uses 'reasonable suspicion' to make arrests." *Id.* Those statements plainly conflict with the agencies' statutory and regulatory mandates, not to mention their representations in the Broadcast Policy.

## II.    Standing

As a preliminary matter, Defendants argue that Plaintiffs lack standing to seek injunctive relief. "To have standing to assert a claim for prospective injunctive relief, a plaintiff must demonstrate 'that he is realistically threatened by a repetition of [the violation].'" *Melendres v. Arpaio*, 695 F.3d 990, 997 (9th Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). Plaintiffs may show "that the defendant had, at the time of the injury, a written policy, and that the injury stems from that policy," or "that the harm is part of a pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights." *Id.* (internal quotation marks and citations omitted).

Citing *Lyons*, Defendants contend that "Plaintiffs rely on fear, not reality, to argue their unlawful arrest is imminent." Defs.' Resp. 8.

This case is not *Lyons*. There, the plaintiff sought an injunction prohibiting the Los Angeles Police Department from using chokeholds in traffic stops. *Lyons*, 461 U.S. at 98, 105-06. The Supreme Court noted that "to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also . . . that the City ordered or authorized police officers to act in such manner." *Id.* at 105-06. Lyons failed to allege a likelihood of future harm because, to be harmed in the same way, he would have had to violate a traffic law, get stopped for that violation, and then be placed in an unprovoked chokehold. *Id.* at 108.

Here, Plaintiffs are at a significantly higher risk of being repeatedly subjected to the unlawful conduct than was Lyons. This case differs from *Lyons* in at least four important respects. First, Plaintiffs are members of a significantly smaller, more discrete and identifiable community than the population of Los Angeles of which Lyons was a member. *See* Cunnings Decl. Ex. 34, at 1, 6 (ECF No. 64-34) (2023 American Immigration Council analysis showing that about 9.5% of Oregon residents are immigrants and about 24.5% of those immigrants are undocumented; in total, about 2.3% of Oregon's population is undocumented). Second, as described above, ICE is *explicitly targeting and stopping* Plaintiffs. Third, ICE officers are stopping class members without regard to any alleged traffic violation, so Plaintiffs are in danger the moment they open their front doors. Yet, even that minimal protection of being free from government harassment assumes ICE officers will comply with the longstanding constitutional requirement of first obtaining a judicial warrant before entering one's home, which they have also allegedly violated in other cases. Fourth, Defendants here decidedly have a pattern of

engaging in the challenged conduct. *See Lyons*, 461 U.S. at 110 n.9 (noting that no evidence established a pattern of the challenged conduct).

Further, the Ninth Circuit has already rejected Defendants' arguments in *Melendres* and in *Vasquez Perdomo v. Noem*, 148 F.4th 656, 674 (9th Cir. 2025). In *Melendres*, the plaintiffs alleged that the defendant sheriff's office had an unconstitutional policy of racially profiling and stopping Latino drivers without the required individualized suspicion or cause. *Melendres*, 695 F.3d at 994. The plaintiffs argued that these sweeps were meant to "target[] Latinos as part of their immigration enforcement plan." *Id.* The defendants argued that the plaintiffs' threat of future harm was not sufficiently likely to warrant prospective relief. *Id.* at 997. The Ninth Circuit rejected that argument and found that plaintiffs had standing to seek prospective relief because they presented evidence of the defendants' practice of conducting targeted, unlawful stops:

> Exposure to this policy while going about one's daily life, the district court determined, constitutes "ongoing harm and evidence that there is 'sufficient likelihood' that the Plaintiffs' rights will be violated again." The district court specifically found that the Defendants had a policy and practice of violating the Plaintiffs' Fourth Amendment rights. Thus, although it held that the likelihood of a future stop of a particular individual plaintiff may not be "high," we are not convinced that the district court erred in determining that future injury was nevertheless "sufficiently likely" given the Defendants' stated policy and practice. . . . [E]ven if the Plaintiffs comply with all criminal laws enforceable by the Defendants, under the Defendants' view of the Fourth Amendment, the Plaintiffs remain vulnerable to unlawful detention *solely* because an officer has reasonable suspicion or knowledge that they are not authorized to be present in the United States.

*Id.* at 998. This case is on all fours with *Melendres*: Plaintiffs present evidence of Defendants' targeted pattern and practice of violating Plaintiffs' constitutional rights, and Plaintiffs are vulnerable to that practice simply by their presence in the United States. Further, Plaintiffs' daily exposure to Defendants' immigration enforcement practices employing warrantless arrests without conducting a pre-arrest assessment of someone's likelihood of escape causes significant

ongoing harm. For example, C.G. testified that his family was afraid to open their front door for weeks and that his grandchild was afraid to go to school. He and his grandchild have also had to seek mental health treatment to cope with the stress ICE caused. And, as in *Melendres*, although Plaintiffs could never prove a certain statistical likelihood that they will be subject to the same abuse, Defendants' practice of aggressively targeting people on racial lines and conducting unlawful warrantless arrests gives rise to a sufficient likelihood of harm. *See also Vasquez Perdomo*, 148 F.4th at 674 (finding that plaintiffs had standing to prohibit ICE from stopping people without reasonable suspicion of immigration violations). Plaintiffs may stand and this Court will hear their claims.

## III.    Provisional Class Certification

Plaintiffs request provisional class certification of the "Unassessed Escape Risk Subclass."[7] A district court may provisionally certify a proposed class for purposes of issuing a preliminary injunction where the class meets the requirements of Federal Rule of Civil Procedure 23(a). *Meyer*, 707 F.3d at 1041-43. The Court may provisionally certify a class with the understanding that "[a]n order that grants . . . class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1).

Under Rule 23(a), parties seeking class certification must establish:

(1) that the class is so large that joinder of all members is impracticable (numerosity); (2) that there are one or more questions of law or fact common to the class (commonality); (3) that the named parties' claims are typical of the class (typicality); and (4) that the class representatives will fairly and adequately protect the interests of other members of the class (adequacy of representation).

---

[7] Plaintiffs' Motion for Class Certification is still being briefed. The Court reserves ruling on that motion and considers only provisional certification at this stage.

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (emphasis added). In addition to satisfying Rule 23(a), a party must also satisfy Rule 23(b) by showing "a risk of . . . inconsistent or varying adjudications with respect to individual class members" or that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ." Fed. R. Civ. P. 23(b)(1).

"As the parties seeking class certification, the plaintiffs must affirmatively demonstrate their compliance with Rule 23, by a preponderance of the evidence." *White v. Symetra Assigned Benefits Service Co.*, 104 F.4th 1182, 1201 (9th Cir. 2024) (quotation marks, alterations, and citations omitted). Accordingly, "often the pleadings alone will not resolve the question of class certification and . . . some discovery will be warranted." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009).

Here, Plaintiffs meet the requirements for provisional class certification under Rule 23, even considering the limited class evidence Plaintiffs have at this early stage in the case. First, the proposed subclass members are sufficiently numerous that joinder is impracticable. "Where a plaintiff seeks 'only injunctive and declaratory relief, the numerosity requirement is relaxed and plaintiffs may rely on reasonable inferences arising from plaintiffs' other evidence that the number of unknown and future members is sufficient to make joinder impracticable.'" *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1203 (N.D. Cal. 2017) (quoting *C.R. Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 317 F.R.D. 91, 100 (N.D. Cal. 2016)), *aff'd*, 867 F.3d 1093 (9th Cir. 2017). Evidence shows that ICE has already arrested hundreds of Oregonians and are targeting thousands more. Cunnings Decl. Exs. 34-36; Chief Michael W. Banks (@USBPChief), X (Nov. 14, 2025 at 5:07 PM), *available at* https://perma.cc/34TS-5UUW ("In October alone, over 560 criminal illegal

aliens living in our neighborhoods were targeted and apprehended" in Portland, Oregon.). Further, as noted above, ICE's standard practice is to transport *all* arrestees to the Portland ICE facility and then detain *all* arrestees at the Tacoma ICE facility unless someone suffers a major medical condition. It is inconceivable to this Court that everyone would be lawfully detained without a warrant if ICE agents were actually conducting legitimate pre-arrest determinations of likelihood escape for everyone they stopped.

Even assuming that only a portion of immigration arrests in Oregon were, or will be, made pursuant to ICE's unlawful practice, Plaintiffs have satisfactorily shown that members of the subclass are sufficiently numerous. *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022) ("Where, as here, the class seeks only prospective injunctive and declaratory relief, the practical value of joining *each* of the 300+ class members as a formal party is slim to non-existent and is plainly outweighed by the substantial logistical burdens that would entail.").

Second, Plaintiffs' claims share one or more common questions of law or fact with members of the subclass. Plaintiffs and subclass members all challenge Defendants' practice of making warrantless arrests without escape risk determinations. Multiple, identical questions of law, such as those addressed below, are therefore common to the subclass. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (noting that "commonality only requires a single significant question of law or fact").

Third, Plaintiffs' claims are typical of the proposed subclass because they assert the same claims and seek the same relief. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation marks omitted).

Although the individual facts surrounding each case may differ, M-J-M-A- and C.G.'s claims are typical of the class in that they each challenge ICE's practice of arrests without a probable cause determination of escape risk.

Fourth, class representatives and their counsel "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court looks to whether Plaintiffs or their counsel have any conflicts of interest with other class members and whether Plaintiffs and their counsel will "prosecute the action vigorously on behalf of the class[.]" *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018). The named Plaintiffs do not request any relief particular to themselves; they assert only interests that are consistent with those of the subclass. The proposed class counsel have also demonstrated their ability to effectively litigate this case and past experience that suggests the same. *See generally* Manning Decl.

Finally, Plaintiffs also show that provisional class certification is appropriate because separate claims by individual class members "would create a risk of . . . inconsistent or varying adjudications[.]" Fed. R. Civ. P. 23(b)(1). Identical legal questions, like those discussed below, could be presented by multiple putative class members, so there is a real risk of inconsistent adjudication. Further, Defendants "ha[ve] acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). Defendants' conduct applies to all subclass members who have been or will be arrested pursuant to that practice, such that class-wide injunctive relief is appropriate.

For those reasons, the Court provisionally certifies the Unassessed Escape Risk Subclass, comprised of all persons who, since September 28, 2025, have been or will be arrested in the District of Oregon for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk. The Court also

provisionally appoints Plaintiffs' counsel from Innovation Law Lab as counsel for the provisionally certified Plaintiff class.

## IV.    Motion for Preliminary Injunction

### A.    Likelihood of Success on the Merits

Plaintiffs must show that they are likely to succeed on their claims that Defendants' actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 702(2)(a); *Waterkeeper All. v. U.S. Env't Prot. Agency*, 140 F.4th 1193, 1214 (9th Cir. 2025). Judicial review is only available under the APA for "final agency action." 5 U.S.C. § 704; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990). Defendants argue that Plaintiffs fail to allege conduct amounting to final agency action.

### 1.    Final Agency Action

Agency action is defined in the APA as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent[,] or denial thereof, or failure to act." 5 U.S.C. § 551(13). "An agency action is final only if it both (1) mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature, and (2) is one by which rights or obligations have been determined, or from which legal consequences will flow." *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023) (quotation marks and citation omitted). This inquiry "requires focus on the practical and legal effects of the agency action, not on labels, and finality is interpreted in a pragmatic and flexible manner." *Id.* (quotation marks and citation omitted).

An agency's policy, pattern, or practice may be considered when determining whether its conduct amounts to final agency action. *See Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 924-25 (9th Cir. 1999). The fact that a policy, pattern, or practice is not committed to writing is not dispositive; both logic and law require unwritten policies to be reviewable. Any

ruling to the contrary would allow agencies to avoid review by simply not putting their decisions in writing. *See R.I.L.-R. v. Johnson*, 80 F. Supp. 3d 164, 184 (D. D.C. 2015) (explaining such reasoning).

As Plaintiffs point out, at least three federal courts have already found that the challenged policy amounts to final agency action. *Escobar Molina*, 2025 WL 3465518, at *22-23; *Ramirez-Ovando*, 2025 WL 3293467, at *19-20; *Nava*, 435 F. Supp. 3d at 902-03.

Plaintiffs proffer significant evidence to demonstrate that Defendants are executing the same policy in Oregon. Plaintiffs' cases are not unique, but rather part of a larger pattern and practice of conducting warrantless arrests in Oregon without making the requisite individualized probable cause determinations.

First, the challenged conduct is far from tentative or interlocutory—Defendants' officers have already executed this practice in Oregon communities and continue to do so. *See, e.g.*, Cunnings Decl. ¶¶ 22-29 (attaching exhibits showing declarations by various Oregon counties of a State of Emergency related to ongoing federal immigration enforcement); Michael W. Banks, "Operation Oregon Support: PORTLAND SWEEP," X, November 14, 2025, *available at* https://x.com/USBPChief/status/1989500427121918422?s=20 (last visited Feb. 6, 2026) (U.S. Border Patrol Chief Michael Banks' statement on X that in October of 2025 in Portland, Oregon, "over 560 criminal illegal aliens living in our neighborhoods were targeted and apprehended."). The record is replete with examples demonstrating Defendants' pattern and practice of conducting warrantless arrests without first making the required individualized probable cause determinations.

The evidence demonstrates that ICE fails to meaningfully question individuals or document facts known to the officers at the time of arrest that could establish probable cause of

detainees' likelihood of escape before officers can obtain a warrant. Instead, officers copy and paste language and broadly cite general immigration violations or information obtained *after* the time of arrest. *See*, *e.g.*, Pet'r's Ex. 109 (M-J-M-A-'s I-213 form does not articulate that she posed an escape risk, and narrative indicates that she "was advised she was under arrest for immigration violations" before officers fingerprinted her and knew her identity, alienage, or immigration status); C.G. Decl. ¶¶ 9, 11, 14 17 (C.G. showed officers his lawful work permit but was nevertheless told he was "an illegal," arrested, and detained for three weeks); Juana A. Decl. ¶¶ 7, 10, 14, 18, 21 (Juana A. was placed under arrest and handcuffed in the back of an ICE car without any justification despite being a lawful permanent resident); Tr. 399-401 (officer who drafted the encounter narrative was not present at time of stop, relied on inaccurate information for that narrative, and used "the same" erroneous narrative for all seven individuals detained with M-J-M-A-); Tr. 279 (ECF No. 56) (officer who processed M-J-M-A- knew nothing about her arrest except basic identifying information and that provided in the encounter narrative, which was substantively inaccurate). These determinations need to occur *before* a warrantless arrest is made for that arrest to be lawful.

Additionally, when the officers who stopped and arrested M-J-M-A- were asked in Court about their probable cause determinations, they cited mundane, non-criminal characteristics and activities and cited almost no facts that should have been considered when making a likelihood of escape determination. For example, one officer testified that, although "[i]t was relayed to [him], before [they] even got to the area, [that] it's a large area for agricultural work," and he knew that agricultural workers "leave early in the morning to work in the fields," it was "off" to see adults getting into a vehicle early in the morning. Tr. 175-76, 202. The same officer stated that because people were speaking Spanish and the driver had failed to comply (within "a couple

of seconds" of receiving an order to roll down the window), the van's passengers "could've been a part of either alien smuggling or transportation of aliens." Tr. 181, 246. Another officer offered that "a *possible* hit of [M-J-M-A-'s] identity and then another person saying that they're all from Mexico, . . . that was justified for the investigative detention *and the arrest*." Tr. 254. Another stated that she had probable cause to believe M-J-M-A- was in the country illegally because M-J-M-A- was speaking Spanish and was "a possible" but unconfirmed match on Mobile Fortify. Tr. 432. The officers' testimony revealed that they focus on finding immigration violations and neglect the equally important requirement that the individual to be arrested is "likely to escape before a warrant can be obtained." 8 U.S.C. § 1357(a)(2).

Of the five arresting officers, one testified that they were "asking the mandatory questions that [they] have to," such as "what country are you a citizen of? Or if you have any documents, any medical issues, any children." Tr. 251. One officer testified that officers conducted "field interviews" and "people were confirming, 'Yes, I'm here in the United States without any status, and I'm from Mexico.'" Tr. 262 (ECF No. 55). He also stated that someone in the van "actually said that they're all going to work and they're all from Mexico." Tr. 253. Another officer stated that at the transport station between Woodburn and Portland, she asked M-J-M-A- "if she was single or married," but M-J-M-A- declined to answer. Tr. 430. But no officer testified that they determined whether the van's occupants were likely to escape *before* they decided to arrest everyone. Rather, they immediately handcuffed them and began placing them in patrol cars for transport.

The evidence also demonstrates ICE's practice of fabricating warrants after arrests were made. Tr. 306 (if an officer "encountered a file that did not have a warrant for arrest, an I-200," he would create one); Tr. 356 (officer affirming that "for any case" involving a warrantless

arrest, he would "create a warrant for the arrest after" individuals were detained at ICE field

offices). This practice of creating warrants after the fact is highly probative of ICE's failure to

make individualized determinations of one's escape risk prior to arresting them. That is

especially true where, as in M-J-M-A-'s case, the encounter narratives for arrestees were exactly

"the same." Tr. 401.

Further, evidence established that *every* individual "brought to the field office in Portland

to be processed" is "detained and sent to the [NWIPC] in Tacoma," "[u]nless there [are] exigent

circumstances, medical or family or something like that." Tr. 361; Tr. 357-64 (people were not

considered for release at Portland ICE facility prior to detention in Tacoma: "we were detaining

everyone we arrested" absent exigent circumstances such as "major medical issues"). An ICE

supervisor testified that he believed there was "instruction or understanding among the

supervisors . . . that people who were brought to the facility [in Portland] . . . would be

transported to Tacoma." Tr. 361. This is true regardless of whether an arrestee indicates they

wish to stay in the United States and seek legal status or agrees to a voluntary return on their I-

826 form. Additionally, once detainees' "files [were] ready," including fingerprints, completed

forms, and the service of charging documents, processing officers and supervisors worked

quickly to transport detainees out of the state. Tr. 376 (". . . on a busy day, the transport needs to

happen as soon as—as soon as they have the files ready").

ICE's unlawful warrantless arrest practice is further demonstrated by reports of people

with lawful status being detained and arrested. Cunnings Decl. Ex. 2, at 2 (ECF No. 64-2) (U.S.

citizen in Portland was arrested and detained despite telling officers he was born in California);

Cunnings Decl. Ex. 14, at 2-4, 11 (ECF No. 64-14) (Oregon resident with lawful permanent

resident status was asked where she was from and immediately told she was under arrest, thrown

to the ground, and handcuffed in the back of an ICE vehicle for close to half an hour); Cunnings Decl. Ex. 15, at 2 (ECF No. 64-15) (officer stated that they "[did]n't care" that subject was a U.S. citizen, shattered his car window, and arrested him); Cunnings Decl. Ex. 16, at 2 (ECF No. 64-16) (two U.S. citizens, including a minor child, were arrested and detained); Cunnings Decl. Ex. 32, at 5 (ECF No. 64-32) ("Americans detained by ICE have said they were held for hours or longer before being allowed to prove their citizenship").

Other judges in this district have recently found that ICE committed the same unlawful warrantless arrest practice. *B.D.A.A. v Bostock*, No. 25-2062, 2025 WL 3484912, at *7 (D. Or. Dec. 4, 2025) ("Respondents do not say that they conducted a flight risk assessment. And they provide no facts or documentation to discern any basis to make such assessment. . . . Here, the facts support that Petitioner was in fact not a flight risk," but she was nonetheless arrested without a warrant); *M.L.G.G. v. Wamsley*, No. 25-2012, 2025 WL 3539183, at *1 (D. Or. Dec. 10, 2025) (ordering petitioner's release after she was arrested despite telling "the officers only her name, the city where she lives, that she was not a minor, and that she spoke Mam"); *A.B.D. v. Wamsley*, No. 25-2014, 2026 WL 178306, at *1 (D. Or. Jan. 22, 2026) ("The parties do not dispute that ICE officers did not make an individualized assessment of each Petitioners' flight risk as required to make a warrantless arrest under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii).").

The Court also takes judicial notice of the fact that ICE has been accused of similar conduct in other Oregon cases. Though only allegations at this time, they raise significant concerns about the existence of a pattern or practice. *L-A-R-A- v. Wamsley*, No. 25-1994, ECF No. 1, at 10-12 (D. Or. 2025) (petitioner alleging he was arrested by masked officers after visiting a Mexican supermarket without explanation or question into "his family, employment, or

community ties"); *M-E-G-G- v. Hermosillo*, No. 25-2160, ECF No. 9, at 1-4 (D. Or. 2025)

(petitioner alleging that an ICE "truck drove head-on towards [her]" before stopping and

arresting her despite significant community ties; she felt that officers at the Portland facility

"'express processed' [her] because it was so fast, and [she] did not spend much time there"

before being detained in Tacoma); *J.Y.L.C. v. Bostock*, No. 25-2083, ECF No. 1, at 5 (D. Or.

2025) (petitioner alleging that he "is a noncitizen lawfully present in the United States" but ICE

"arrested and detained Petitioner on November 8, 2025, without providing a lawful basis for

detention or an individualized determination of flight risk or danger to the community").

     Public statements from Defendants' officials further demonstrate a commitment to

conducting unlawful warrantless arrests. As in *Escobar Molina*, "finding that defendants have

implemented [the alleged] policy and practice does not require a far leap of logic: defendants

*themselves* have repeatedly emphasized an abandonment of the probable cause standard."

*Escobar Molina*, 2025 WL 3465518, at *23 (citing, among other agency representations, Chief

Border Patrol Officer Gregory Bovino's statement that "We need reasonable suspicion to make

an immigration arrest. . . . You notice I did not say probable cause, nor did I say I need a warrant.

We need reasonable suspicion of illegal alienage that's well grounded within the United States

immigration law."); Cunnings Decl. Ex. 32, at 1 (report of Stephen Miller's order to federal

officers to "just go out there and arrest illegal aliens"); *DHS Debunks Governor Pritzker's

Harmful Lies About Operation Midway Blitz in Chicago, Federal Law Enforcement*, U.S. DEP'T

HOMELAND SECURITY (Oct. 6, 2025), *available at* https://perma.cc/AD8TMK8G ("DHS law

enforcement uses 'reasonable suspicion' to make arrests.").[8] "[T]hese statements are taken at

---

[8] The Court takes judicial notice of this discussion on the Department of Homeland Security's
website.

face value as reflecting the current policy and practice of DHS and federal law enforcement agents making civil immigration arrests." *Escobar Molina*, 2025 WL 3465518, at *23. Accordingly, Defendants' practice of conducting warrantless arrests without the required individualized probable cause determination of escape risk is not tentative or interlocutory and rather, represents the consummation of Defendants' decisionmaking process to engage in this unlawful conduct.

Second, individual rights are plainly affected by the challenged conduct. Each of the individuals who were arrested because of this practice have already experienced very real harm as a result of the violations of their individual rights. Additionally, ICE's widespread targeting continues to affect the rights of those perceived by officers as "targets" of their operations. As discussed above, ICE's misconduct leads not only to unlawful detention and deportation, but also deprives victims of precious time away from their families, their work, and the ability to support their families. Further, records of their detention and the information obtained during processing may create new immigration nexuses that serve as the basis for immigration stops in the future. *See*, *e.g.*, Tr. 124-25 (officers create target packages and stop targets for having immigration nexuses, stemming from past immigration history, including official proceedings and enforcement involvement).

As a final matter on this point, Defendants point to a January 28, 2026 memo by acting ICE Director Todd Lyons to demonstrate either a lack of past policy, pattern, or practice, or evidence of a new policy that effectively moots Plaintiffs' claims. These arguments are uncompelling. As an initial matter, the memo does not purport to announce a new policy, but rather, "serves as a reminder" of existing authority. Additionally, Defendants' voluntary cessation of challenged conduct does not moot this case. *See Demery v. Arpaio*, 378 F.3d 1020,

1026 (9th Cir. 2004) (noting that "injunctive relief does not become moot by defendants'

voluntary cessation of allegedly wrongful behavior unless it is absolutely clear that the allegedly

wrongful behavior cannot reasonably be expected to recur") (quotation marks omitted)

(quoting *Fed. Trade Comm'n v. Affordable Media, LLC*, 179 F.3d 1228, 1237-38 (9th

Cir.1999) ("If an *employee* leaves the employ of an employer, she can not obtain injunctive relief

to prevent her former employer from engaging in future retaliation . . . It would obviously be a

different case if an *employer* claimed that an injunction to prevent future retaliation against

current employees was no longer necessary because the employer had stopped retaliating . . .")

(citation omitted)). This is especially true here, where Defendants have a longstanding history of

noncompliance with these same laws. The Court has no confidence that they will cease the

unlawful practices, even, if not especially, when they insist with a straight face they are

complying with the law.

In sum, Defendants' pattern and practice of arresting people without a warrant and

without the required probable cause determinations amounts to final agency action because it is

affecting fundamental individual rights in real time.

2. <u>Contrary to Law</u>

Defendants argue that Plaintiffs are unlikely to succeed on their claims that Defendants'

pattern or practice is unlawful or otherwise unsound under the APA. That statute enables courts

to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A).

As noted, the INA only permits immigration officers to make warrantless arrests when

the officer has probable cause to believe two things: (1) that the individual "is in the United

States in violation of [the immigration laws]"; and (2) that the individual "is likely to escape

before a warrant can be obtained." 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii); *Tejeda-*

*Mata*, 626 F.2d at 725. Probable cause determinations must be based on facts particularized to that person and known *prior to* the arrest. *Ybarra*, 444 U.S. at 91; *Devenpeck*, 543 U.S. at 152. Apparent ethnicity and race, on their own, cannot give rise to *reasonable suspicion* for an immigration stop, much less probable cause. *Brignoni-Ponce*, 422 U.S. at 886-87. A person's proximity to others suspected of unlawful activity, without more, also cannot serve as the basis for probable cause. *Perez Cruz v. Barr*, 926 F.3d 1128, 1138 (9th Cir. 2019). Although probable cause "is not a high bar," it does require "a probability or substantial chance" of the conduct in question. *Kaley v. United States*, 571 U.S. 320, 338 (2014); *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quotation marks and citation omitted).

Plaintiffs have shown a high likelihood of success on the merits of their claims that Defendants' practice of arresting individuals without warrants and without the dual probable cause determinations is contrary to law. Defendants dispute whether such practice exists, but they do not dispute that any such practice would be patently unlawful. Little analysis is required to show that arresting someone without a warrant and without probable cause of their likely escape is contrary to the INA. This Court agrees with the thoughtful reasoning of other district courts that have found that this practice likely violates the law. *Escobar Molina*, 2025 WL 3465518, at *27 ("Defendants' systemic failure to apply the probable cause standard, including the failure to consider escape risk, directly violates the clear statutory requirements under the INA … and DHS's implementing regulations); *Ramirez*, 2025 WL 3293467, at *20 ("defendants likely have a policy, pattern, and/or practice of violating [the immigration statutes and regulations] by effecting warrantless arrests without individualized probable cause"); *Castañon Nava*, 806 F. Supp. 3d at 843 (arresting officers' I-213 forms contained insufficient probable cause to support warrantless arrests, in violation of Broadcast Policy).

Plaintiffs are likely to succeed on the merits of their claims. Defendants are likely engaging in the unlawful practice of conducting warrantless arrests without an individualized probable cause determination of a person's likelihood of escape.

## B.    Irreparable Harm

Next, Defendants contend that Plaintiffs are unable to establish that they will suffer irreparable harm absent a preliminary injunction because (1) their alleged injury is speculative and unlikely to manifest, and (2) Plaintiffs' delay in filing their motion suggests their claimed injuries are non-emergent. Defs.' Resp. 25-27.

Irreparable harm is "harm for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres*, 695 F.3d at 1002) (quotation marks omitted).

With this record, the Court has no trouble concluding that Plaintiffs and putative class members face irreparable harm due to Defendants' pattern and practice of conducting warrantless arrests without individualized escape risk determinations. Indeed, significant evidence indicates that Defendants already violated Plaintiffs' constitutional rights. As in *Ramirez Ovando*, "[a]lthough none of [the Plaintiffs] presented [an escape] risk by any reasonable measure, they were each arrested and detained without warning," ultimately spending significant amounts of time—ranging from hours to weeks—in ICE custody. 2025 WL 3293467, at *20. On its own, that harm is significant, and irreparable. The evidence also establishes that ICE's arrest tactics are violent and brutal and intended to strike fear across the putative class and communities in Oregon. Defendants' disregard of Plaintiffs' dignity adds to Plaintiffs' case for

irreparable harm. Due process requires those with great power to exercise great restraint, and the record demonstrates that Defendants have profoundly failed in that obligation.

Though Defendants argue that any future harm is speculative, nothing indicates that Defendants have scaled back their practices or brought them into compliance with the law. Instead, Defendants continue to target people like Plaintiffs through far-reaching and plainly unlawful practices. Accordingly, the Court finds that Plaintiffs and putative class members have and will continue to suffer irreparable physical, financial, and emotional harm if ICE's unlawful warrantless arrest practice is not enjoined.

### C.    Balance of Equities and Public Interest

Finally, where the government opposes a preliminary injunction, the last two factors in the preliminary injunction analysis merge, because any harm to the public interest impacts the balance of the equities. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "It is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quotation marks and alterations omitted). The government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Further, when the government's alleged action violates federal law, the combined balance of equities and public interest generally weighs in favor of the plaintiffs. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

Defendants assert that the balance of equities weighs in their favor because the injunction Plaintiffs seek would "interfere with the government's significant immigration enforcement function[.]" Defs.' Resp. 28. Defendants' argument betrays them: Plaintiffs do not challenge Defendants' authority to make lawful immigration arrests, and Defendants cannot contend they have any legitimate interest in a practice that systematically violates federal law and individual

constitutional rights. Although Defendants have authority to enforce immigration law, they must do so within the bounds of that law, that is all. Otherwise they are not enforcing the law, but rather, perpetrating some other unsanctioned agenda. Defendants' argument that compliance will be burdensome is unavailing. The requirements of due process are necessarily weighty to ensure the government does not abuse its substantial power. This injunction will not interfere with lawful enforcement efforts.

Significant portions of our Oregon community are living each day with anxiety and fear of opening their front door, shopping for groceries, or attending school, due in significant part to Defendants' unlawful practices. Equity and public interest thus demand an injunction bringing Defendants into compliance with the law. For those reasons, the balance of equities and public interest tip sharply in Plaintiffs' favor. A preliminary injunction is appropriate.

## V.    Relief and Bond

The Court finds that ample evidence in this case demonstrates a high likelihood—if not a certainty—that Defendants are engaging in a pattern and practice of unlawful conduct in Oregon that will continue to harm class members absent injunctive relief. The Court GRANTS Plaintiffs' Motion for Preliminary Injunction and their accompanying requests (1) through (5):

1. The Court provisionally CERTIFIES the Unassessed Escape Risk Class, comprised of all persons who, since September 28, 2025, have been or will be arrested in the District of Oregon for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk.
2. The Court provisionally APPOINTS Plaintiffs' counsel from Innovation Law Lab as counsel for the provisionally certified Plaintiff class.
3. The Court preliminarily ENJOINS Defendants and their officers from enforcing their policy or practice of making warrantless civil immigration arrests in the District of Oregon without a pre-arrest individualized determination by the arresting officer of probable cause that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii).

4. The Court ORDERS that Defendants shall promptly transmit this Order to Defendants' officers, employees, officers, and contractors who have responsibilities related to the subject matter of this injunction.

5. The Court ORDERS that Defendants shall report every 30 days until this litigation is concluded (or if requested by Plaintiffs' counsel concerning specific individual warrantless arrests, no later than seven days after the request) on the following: Any Defendant or their officer who conducts a warrantless civil immigration arrest in the District of Oregon shall, as soon as practicable, document the facts and circumstances surrounding the warrantless civil immigration arrest in narrative form. This documentation shall include specific, particularized facts that supported the officer's pre-arrest probable cause to believe that the person is likely to escape before a warrant can be obtained, including the following facts that are consistent with 8 U.S.C. § 1357(a)(2): "that the alien was arrested without a warrant"; "the location of the arrest and whether this location was a place of business, residence, vehicle, or a public area"; "the alien's ties to the community, if known at the time of arrest, including family, home, or employment"; and "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." The documentation shall include the date and time of the arrest, and the date and time the officer completed the documentation. In describing the individualized assessment of escape risk in the documentation ordered above, specific details as to the person being arrested must be provided such that the use of boilerplate language may be deemed indicative of noncompliance.

As a final matter, there is no likelihood that Defendants will be harmed by an injunction that requires them to comply with the law. In the interests of justice, Plaintiffs need not provide security, and the Court waives all requirements under Fed. R. Civ. P. 65(c). *InSinkErator, LLC v. Joneca Co., LLC*, 163 F.4th 608, 623 (9th Cir. 2025) (courts have "wide discretion in setting the amount of a security bond") (quotation marks omitted); *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("In particular, [a court] may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining [their] conduct.") (quotation marks omitted).

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunction and request for provisional class certification, ECF No. 61, is GRANTED.

This record, these claims, Defendants' actions, and the import of our laws bear further and brief comment.

First, there is no question that in accordance with the laws Congress has passed, the Executive Branch has the authority to deport people who are not lawfully in the United States. That authority is not an unbounded prerogative, but rather the Executive Branch must abide by those laws, its own regulations, and due process. This Court has observed that in the District of Oregon many more people have been reported detained and transported to the ICE detention facility in Tacoma, Washington, than have filed petitions for relief. M-J-M-A-'s own testimony explains that several people with whom she was detained were forced to "voluntarily" deport.

There is no telling how many people would have sought counsel, or would have benefited from it. It is clear that there are countless more people who have been rounded up, and who either remain in detention or have "voluntarily" deported than those, like M-J-M-A-, who were fortunate enough to find counsel at the eleventh hour. Defendants benefit from this blitz approach to immigration enforcement that takes advantage of navigating outside of the boundaries of conducting lawful arrests. For the one detainee who has the audacity to challenge the legality of her detention and gains release, several more remain detained or succumb to the threat of lengthy detention, and then instead "voluntarily" deport. Defendants win the numbers game at the cost of debasing the rule of law.

Finally, this Court has previously described ICE officers' field enforcement conduct as brutal and violent. The practices are intended to strike fear across large numbers of people throughout Oregon. The persistent intensity of regular ICE immigration enforcement operations may very well have the intended effect of normalizing this level of violence. If this normalization continues, then even greater harm will be inflicted. Our Constitution, our statutes and

regulations, must always remain our constant and universal standard of measuring lawful and appropriate government action. Indeed, if Defendants regarded those standards in the first instance, this case would not likely exist.

DATED this 27th day of February 2026.


s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (he/him)
United States District Judge