UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

M-J-M-A, and VICTOR C.G.,[1] *individually and on behalf of all similarly situated individuals*,

Plaintiffs,

v.

JULIO HERNANDEZ, *Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations*; TODD LYONS, *Acting Director of Immigration and Customs Enforcement*; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; KRISTI NOEM, *Secretary of the Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; and PAMELA BONDI, *Attorney General of the United States*; LAURA HERMOSILLO, *Seattle Field Office Director, Immigration and Customs Enforcement and Removal Operations ("ICE/ERO")*,

Defendants.

Case No. 6:25-cv-02011-MTK

**OPINION AND ORDER**

**KASUBHAI,** United States District Judge:

> "To abandon facts is to abandon freedom. If nothing is true, then no one can criticize power, because there is no basis on which to do so. If nothing is true, then all is spectacle." Tim Snyder, *On Tyranny*

[1] The Court abbreviates Plaintiffs' full names in the interest of their safety. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000) (noting that "many federal courts, including the Ninth Circuit, have permitted parties to proceed anonymously when special circumstances justify secrecy"). Defendants are aware of their full names.

An ICE officer fabricated facts in official records to justify an arrest. This Court knows this because at an evidentiary hearing on Plaintiffs' Motion to Enforce Preliminary Injunction, he testified under oath that what he wrote in the official records of the arrest were incorrect. On the witness stand he minimized the error as mere oversight. This Court found he lied after evaluating his live testimony and the documentary evidence.

Evaluating live testimony is a time-tested method for truth finding. Written declarations are convenient, but insufficient on their own when witnesses are willing to lie. This enforcement action is a powerful reminder of two principles.

First, uncovering truth is not a passive activity. Developing a robust evidentiary record worthy of telling the story of what really happened can never fully materialize from a stack of signed written statements. Live testimony is necessary. Examination and cross-examination are necessary. The trial courts are the uniquely specialized forum in which building a full evidentiary record is possible.

Second, this case underscores what happens if people were not called to testify under oath in a courtroom, if as a society we do not demand that government agents explain their actions, and if the public fails to shine a spotlight on what is happening under cover—people with authority know they will not be held to account.

## PROCEDURAL BACKGROUND

On February 4, 2026, the Court issued a preliminary injunction enjoining U.S. Immigration and Customs Enforcement ("ICE") from conducting warrantless arrests in the District of Oregon unless, consistent with federal law, the arresting officers made the requisite pre-arrest, probable-cause determination that an individual is likely to escape before a warrant can be obtained. Order, ECF No. 82 at 2-3. To ensure transparency and compliance, the Court also ordered production of certain documentation and monthly reporting requirements. *Id.*

Before the Court now is Plaintiffs' Motion to Enforce Preliminary Injunction. Plaintiffs allege that in the months following the Court's preliminary injunction order, Defendants have "doubled down on their illegal policy or practice" of conducting illegal warrantless arrests and "are routinely violating the injunction in at least five ways." Pls.' Mot. Enforce at 3, ECF No. 131. Specifically, Plaintiffs allege that Defendants are (1) assessing escape risk[2] after conducting warrantless arrests, (2) using an improper standard for assessing escape risk, (3) failing to document the facts and circumstances of warrantless arrests, (4) failing to comprehensively report all warrantless arrests in the District of Oregon, and (5) withholding documentation. *Id*. Defendants deny these allegations and contend that Plaintiffs have not met their burden of proof, that Defendants "have complied with the plain language" of the order, and that the Court lacks jurisdiction to modify its order. Defs.' Resp. at 5, 10, 12, ECF No. 144.

On October 30, 2025, Plaintiff M-J-M-A- filed a Petition for Writ of Habeas Corpus following her arrest and detention by ICE officers. Pet. Habeas Corpus, ECF No. 1. On January 14, 2026, M-J-M-A- added Plaintiff Victor C.G. as a party. Suppl. Pleading, ECF No. 68. Plaintiffs moved to certify a "Warrantless Arrest Class" consisting of "[a]ll person[s] since September 28, 2025, who have been arrested or will be arrested in the District of Oregon for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and that the person poses a flight risk." Pls.' Mot. Class Cert. at 2, ECF No. 60. Plaintiffs also moved to certify an "Unassessed Escape Risk Subclass," consisting of "[a]ll person[s] since September 28,

---

[2] At times, counsel in this case use "flight risk" interchangeably with "escape risk." The Court understands those terms to refer to the "likely to escape" requirement in 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii). The Court will rely on and employ the meaning of the legal terms of art "likely to escape" or "escape risk" unless quoting sources.

2025, who have been arrested or will be arrested in the District of Oregon for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk." *Id*. The Court granted Plaintiff's motion to certify the class and subclass. Order, ECF No. 103.

Plaintiffs additionally moved to preliminarily enjoin ICE's practice of making warrantless arrests without the required probable cause determination of escape risk. Pls.' Mot. Prelim. Inj., ECF No. 61. On February 4, 2026, the Court heard oral argument on the motion. At the end of the hearing, the Court granted Plaintiffs' request for a preliminary injunction. Order, ECF No. 82. The Court found "[a]mple evidence" to demonstrate "a pattern and practice in Oregon that amounts to final agency action of executing warrantless arrests without individualized determinations of flight risk." *Id*. at 2. Consequently, the Court issued several orders to ensure that Defendants and their officers adhered to the law when conducting warrantless arrests.

First, the Court enjoined Defendants and their officers "from enforcing their policy or practice of making warrantless civil immigration arrests in the District of Oregon without a pre-arrest, individualized determination by the arresting officer of probable cause that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii)." *Id.* at 2-3. The Court also ordered Defendants to promptly transmit the Court's order to their officers, employees, and contractors. *Id.* at 3. Finally, the Court ordered Defendants to report every thirty days, until litigation concludes, on any warrantless civil immigration arrests that occur in the District of Oregon, including the facts and circumstances surrounding the arrest, and particularized facts that supported the officer's pre-arrest probable cause determination of escape risk. *Id.* Defendants must also provide this

information within seven days of any request from Plaintiffs concerning specific, individual warrantless arrests. *Id.*

In particular, the Court instructed Defendants to document and report information in narrative form, with details including: "that the alien was arrested without a warrant"; "the location of the arrest and whether this location was a place of business, residence, vehicle, or a public area"; "the alien's ties to the community, if known at the time of arrest, including family, home, or employment"; and "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." *Id.* The Court required Defendants' documentation to include the date and time of both the arrest and the documentation's completion, noting that "the use of boilerplate language may be deemed indicative of noncompliance." *Id.*

On February 27, 2026, the Court issued a written Opinion and Order explaining its findings and reasoning for the decision to grant the preliminary injunction. Order, ECF No. 88. The Court found that "Defendants are likely engaging in the unlawful practice of conducting warrantless arrests without an individualized probable cause determination of a person's likelihood of escape." *Id*. at 46. The Court based its decision on significant evidence of Defendants' pattern of conducting warrantless arrests without individualized probable cause determinations, including evidence that ICE officers failed to meaningfully question individuals at time of arrest, evidence that officers fabricated warrants after arrests, evidence that officers detained individuals with lawful status, and public statements Defendants' officials made about increasing enforcement activity quotas. *Id*. at 37-46. On April 6, 2026, Defendants filed a Notice of Appeal of the Court's preliminary injunction order. ECF No. 93. The appeal remains pending.

Plaintiffs filed a Motion to Enforce the Preliminary Injunction Order on September 4, 2026. ECF No. 131. The Court heard testimony and oral argument on the motion on September 18, 2026, and September 21, 2026. ECF Nos. 156, 157. Plaintiffs called Amber Qureshi, Alyssa Walker Keller, J-C-C-V-, H-F-M-J-, H-D-G-H-, and C-J-V-M- to testify. Defendants called Deportation Officer J.G. to testify. At the hearing, the Court received nineteen exhibits into evidence, including the Declarations of Amber Qureshi, Alyssa Walker Keller, J-C-C-V-, H-F-M-J-, H-D-G-H-, and C-J-V-M (Pls.' Exs. 101, 103, 104, 108, 110, 116); the Declaration of Nelly Garcia Orjuela, and the nine exhibits attached thereto (Pls.' Ex. 117); a spreadsheet of ICE arrest data in Oregon (Pls.' Ex. 102); I-213 forms for J-C-C-V- and H-D-G-H- (Pls.' Exs. 106, 112); I-200 forms for J-C-C-V- and H-D-G-H- (Defs.' Ex. 502; Pls.' Exs. 107, 113); a Notice to Appear and Notice Authorizing Parole for H-D-G-H- (Pls.' Exs. 114, 115); and petitions for writ of habeas corpus and court orders on the petitions (Pls.' Exs. 105, 109, 111, 118). The Court also has before it the Declaration of Jordan Cunnings, ECF No. 134, and the supplemental briefing submitted by both parties.

For the reasons discussed below, Plaintiffs' motion is GRANTED. Defendants consistently failed to follow the Court's preliminary injunction order, and Plaintiffs are entitled to relief more fully described below.

## STANDARD

"The district court has the power to supervise compliance with an injunction[.]" *Hawaii v. Trump*, 871 F.3d 646, 654 (9th Cir. 2017). "[A] district court has jurisdiction to clarify the meaning of its orders even while an appeal is pending." *Thakur v. Trump*, 795 F. Supp. 3d 1168, 1178 (N.D. Cal. 2025); *see also Meinhold v. United States Dep't of Def.*, 34 F.3d 1469, 1480 n.14 (9th Cir. 1994) (noting that district court had jurisdiction "to clarify its original injunction and to supervise compliance" despite ongoing appeal).

Under Federal Rule of Civil Procedure 62(d), a court may also "suspend, modify, restore, or grant an injunction" while the original, underlying injunction is on appeal. The Ninth Circuit "emphasize[d] that the flexibility inherent in equity jurisdiction allows the court, if changed or newly revealed facts or circumstances warrant, to modify its injunction accordingly." *United States v. Washington*, 853 F.3d 946, 979 (9th Cir. 2017); *see also Sys. Fed'n No. 91 Railway Employees' Dep't v. Wright*, 364 U.S. 642, 647 (1961) ("[A] sound judicial discretion may call for the modification of the terms of an injunction decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen."). But any action taken pursuant to Rule 62(d) "may not materially alter the status of the case on appeal." *Natural Res. Def. Council v. Southwest Marine, Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001)[3] (citation omitted); *see id.* at 1166-67 (allowing district court to make "minor adjustments" to the preliminary injunction under Rule 62 "that effectuated the underlying purposes of the original requirements" and "preserved the status quo").

The party seeking modification of an injunction bears the burden of establishing "a significant change in facts or law[.]" *Hawaii*, 871 F.3d at 654 (citing *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000)). The moving party must prove by a preponderance of the evidence that circumstances warranting enforcement or modification of a preliminary injunction exist. *See E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025) (noting that "[t]he usual standard of proof in civil litigation is preponderance of the evidence" unless a statute, the Constitution, or rare cases, such as unusual coercive government action, require a more demanding standard); *cf. Fed. Trade Comm'n v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999) (explaining that a

[3] The *Southwest Marine* Court cited Fed. R. Civ. P. 62(c); however, "Rule 62 was reorganized in 2018, and the pertinent subsection is now 62(d)." *Thakur*, 795 F. Supp. 3d at 1179 n.5.

party moving for civil contempt must show "by clear and convincing evidence that the contemnors violated a specific and definite order of the court" (citation omitted)).

## LEGAL BACKGROUND

The Fourth Amendment's prohibition on unreasonable searches and seizures applies to both citizens and non-citizens. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (explaining that non-citizens "receive constitutional protections when they have come within the territory of the United States and developed substantial connections with the country"). The Constitution allows officers to conduct brief, investigatory stops when an officer has reasonable suspicion that an individual has committed a crime. *Hernandez v. Skinner*, 969 F.3d 930, 937 (9th Cir. 2020) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Immigration regulations codify this standard for ICE officers, allowing officers to "briefly detain" a person for questioning if they have "reasonable suspicion, based on specific articulable facts" that the person is illegally present in the United States. 8 C.F.R. § 287.8(b)(2); *see Sanchez v. Sessions*, 904 F.3d 643, 651 (9th Cir. 2017) (explaining that § 287.8(b)(2) "all but parrots" the *Terry* stop standard). But an extended seizure that "exceeds the bounds of an investigatory stop" can become an arrest. *United States v. In*, 124 F.4th 790, 794 (9th Cir. 2024) (quoting *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014)).

To make lawful immigration arrests, ICE agents must comply with certain administrative regulations. First, officers must have "reason to believe" that an individual is "illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i). The "reason to believe" requirement mirrors the "probable cause" standard. *Bello-Reyes v. Gaynor*, 985 F.3d 696, 701 (9th Cir. 2021) (citing *Tejeda-Mata v. Immigr. Naturalization Serv.*, 626 F.2d 721, 725 (9th Cir. 1980)). Once immigration officers have reason to believe an individual is illegally in the country, the officers then must either (1) acquire a valid warrant for the individual's arrest, or (2) conduct a

warrantless arrest in accordance with the administrative regulations. 8 U.S.C. § 1226(a); 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii).

If an officer decides to issue an administrative warrant, then the warrant must be issued alongside or after the issuance of a notice to appear. *See* 8 C.F.R. § 236.1(b)(1) ("At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I-200, Warrant of Arrest."). In simple terms, the notice to appear is a precondition to an otherwise substantively valid arrest warrant. *See Yith v. Nielsen*, 881 F.3d 1155, 1167 (9th Cir. 2018) (explaining that notices to appear are "required in all removal proceedings," are "akin to a summons," and are distinct from warrants of arrest). When ICE arrests an individual on a valid warrant, the Attorney General can decide whether to detain the individual or release them on bond or parole. 8 U.S.C. § 1226(a). If ICE releases an individual, ICE may later use the previously executed warrant to rearrest and detain the individual again, but only *after* the Attorney General formally revokes bond or parole. *Id.* § 1226(b) ("The Attorney General at any time may revoke a bond or parole authorized under [§ 1226(a)], rearrest the alien under the original warrant, and detain the alien.").

Civil arrest warrants are distinct from criminal arrest warrants. Criminal arrest warrants must be issued by a "neutral and detached magistrate" who determines that probable cause exists for a search or arrest. *Chatrie v. United States*, 146 S. Ct. 2193, 2215 (U.S. 2026) (citing *Johnson v. United States*, 333 U.S. 10, 14 (1948)). Under the Fourth Amendment, a neutral and detached magistrate must be "sever[ed] and disengage[d] from activities of law enforcement." *Shadwick v. Tampa*, 407 U.S. 345, 350 (1972). But the same standard does not apply for civil immigration warrants. These types of warrants, often called "administrative warrants," can be issued by

certain law enforcement officials, without a detached magistrate's review and approval. 8 U.S.C. § 1226(a); *Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 825 (9th Cir. 2020) ("[C]onsistent with the Fourth Amendment, immigration authorities may arrest individuals for civil immigration removal purposes pursuant to an administrative arrest warrant issued by an executive official, rather than by a judge.").

The Supreme Court sanctioned the practice of issuing administrative warrants in *Abel v. United States*, 362 U.S. 217 (1960). The *Abel* Court recognized a long history of administrative warrants. *Id.* at 233. While the *Abel* Court did not opine on the validity of civil immigration arrest warrants, it took care to note that the existing civil arrest procedures were not wholly different from criminal arrests. Like a criminal law enforcement officer, an immigration officer "may not arrest and search on his own." *Id.* at 236. Instead, an "[a]pplication for a warrant must be made to an *independent* responsible officer," like a district director. *Id.* (emphasis added). Administrative warrants can be issued by executive officials, but the *Abel* Court expected that any officials who issue administrative warrants must nonetheless remain independent from the investigation and arrest.[4]

Administrative regulations list over fifty categories of executive officials permitted to issue arrest warrants for immigration violations. 8 C.F.R. § 287.5(e)(2). The list includes officials ranging from district directors, to division chiefs, to supervisory officers. *Id.* Some categories of officers are qualified to both issue and execute warrants. *See, e.g.*, *id.* § 287.5(e)(2)-

---

[4] Legal scholars have discussed how the Supreme Court repeatedly emphasized in its post-*Abel* decisions the constitutional importance of neutral and detached magistrates when issuing warrants, yet the Supreme Court has never returned to answer the questions of "whether administrative arrest warrants have any constitutional significance or whether neutral probable cause review is constitutionally required for deportation arrests." *See* Lindsay Nash, *Deportation Arrest Warrants*, 73 Stan. L. Rev. 433, 442 (2021).

(3) (allowing supervisory and managerial personnel to both issue and execute warrants of arrests for immigration violations). The regulations do not prescribe how independent the issuing officials must be from the investigation. However, the *Abel* Court emphasized that the executive official issuing administrative warrants should be independent from the officers who execute the warrants. If the issuing official is not sufficiently independent, the warrant is invalid. *Cf. Coolidge v. New Hampshire*, 403 U.S. 443, 453 (1971) (declaring criminal warrant invalid and unconstitutional when "issued by the state official who was the chief investigator and prosecutor in [the] case"); *Gonzalez*, 975 F.3d at 824-26 (applying *Gerstein v. Pugh*, 420 U.S. 103 (1975), in the civil immigration context and requiring a prompt probable cause determination "by a neutral and detached magistrate" following detention pursuant to an immigration detainer); *El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249, 276 (D. Conn. 2008) (concluding that, when "an ICE Agent intimately involved in the investigation" signed an immigration arrest warrant, "[n]o neutral magistrate (or even a neutral executive official) ever examined the warrant's validity," rendering the warrant invalid and the arrest warrantless).

In sum, a valid arrest warrant for a civil immigration violation requires (1) a simultaneous or prior issuance of a Notice to Appear, and (2) a sufficiently independent executive officer issuing the warrant for arrest who must confirm a finding that it is reasonably likely an individual is illegally in the United States. Rearresting an individual based on a previously executed warrant first requires that the Attorney General revoke bond or parole. If ICE officials fail to meet those requirements when issuing or executing a warrant, then the arrest warrant is invalid, and any arrest pursuant to the invalid warrant is necessarily a warrantless arrest.

Section 1357(a)(2) of Title 8 United States Code governs warrantless immigration arrests. If an immigration officer arrests an individual in the absence of a valid arrest warrant, then the

officer must follow the requirements outlined in § 1357(a)(2). Immigration officers may make warrantless arrests as an exception to the warrant requirement only when the officer has probable cause to believe that an individual is both (1) "in the United States in violation of [immigration laws]" and (2) "likely to escape before a warrant can be obtained[.]" 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii). This dual probable cause assessment must be completed before an officer makes an arrest, and the analysis must be individualized to the arrestee. *Id.* Probable cause must be based on facts known at the time of arrest and cannot be justified after an arrest on a post-hoc basis. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

## FACTUAL BACKGROUND

The Court issued its preliminary injunction on February 4, 2026, ordering that in the District of Oregon, ICE officers must cease the illegal practice of conducting warrantless arrests without the requisite assessment of an individual's escape risk. Order, ECF No. 82. The Court's written explanation of its Order cited the significant increase in immigration arrests occurring in Oregon during fall 2025. Order at 5-6, ECF No. 88. This increase in Oregon arrests coincided with ICE's nationwide goal of increasing immigration arrests. *Id*. at 5 (citing Deputy Chief of Staff Stephen Miller's stated goal of 3,000 arrests by ICE each day). In 2026, ICE continued to set arrest goals, informing Congress that it aimed to return and remove one million individuals annually, and conduct 400,000 arrests nationwide. Pls.' Ex. 117(i) at 2 (article by Stephen Dinan of Washington Times, dated April 14, 2026).

Since the Court's preliminary injunction order, ICE officials have continued conducting high numbers of arrests in Oregon. *See* Cunnings Decl. Ex. 1. Initially, after the Court's order in February 2026, local non-profit Portland Immigrant Rights Coalition ("PIRC") recorded a "sudden drop in reports" from community members concerned about ICE detentions. Pls.' Ex. 103 ¶ 8; *see also* Cunnings Decl. ¶ 4. But beginning in May 2026, PIRC began receiving "a

sustained increase in calls" from individuals reporting ICE arrests in Oregon. Pls.' Ex. 103 ¶ 9; *see also* Cunnings Decl. ¶ 4. ICE agents in Oregon completed 186 arrests in June 2026, over six times the number of arrests that ICE completed in March 2026. Cunnings Decl. ¶ 4.

In total, from February 5, 2026, to July 31, 2026, Defendants arrested 574 individuals in the District of Oregon. Tr.[5] 46; Pls.' Ex. 102. Of those, 504 arrests were non-custodial arrests.[6] Tr. 46; Pls.' Ex. 102. Non-custodial arrests refer to arrests that occur in the community rather than a custodial setting, as categorized by ICE itself. Tr. 46-47; Pls.' Ex. 101 ¶ 14. Non-custodial arrests are more likely than custodial arrests to be warrantless, given that ICE can generally identify individuals in custody through data-sharing programs and easily issue warrants. Tr. 47.

Despite the high number of non-custodial arrests in Oregon, Defendants reported that only thirteen warrantless arrests occurred in the District of Oregon between February 5, 2026, and August 5, 2026.[7] Pls.' Ex. 117(a)-(h). For those thirteen arrests, Defendants were required,

---

[5] The Transcripts of Court Proceedings are available for the September 18, 2026, and September 21, 2026, evidentiary hearing. ECF Nos. 158-59. This Opinion cites to those documents by reference to the Transcript page numbers ("Tr.").

[6] This Court observes that, in that same time, about fifty-five petitions for habeas corpus relief were filed in the District of Oregon.

[7] Pursuant to the Court's preliminary injunction order, Defendants proactively reported warrantless arrests occurring in the District of Oregon on a monthly basis. Plaintiffs submitted these reports to the Court. *See* Pls.' Ex. 117(a)-(h). Defendants reported no warrantless arrests between February 5, 2026, and March 6, 2026. Pls.' Ex. 117(a) at 1. They reported two warrantless arrests from March 7, 2026, to April 6, 2026. Pls.' Ex. 117(b) at 1. They reported no warrantless arrests from April 7, 2026, to May 6, 2026. Pls.' Ex. 117(c) at 1. They reported two warrantless arrests from May 7, 2026, to June 5, 2026. Pls.' Ex. 117(d) at 1. They reported four warrantless arrests from June 6, 2026, to July 6, 2026. Pls.' Ex. 117(e) at 1. They reported two warrantless arrests from July 7, 2026, to August 5, 2026, though provided documentation for three warrantless arrests. Pls.' Ex. 117(f). Upon Plaintiffs' individual requests for information, Defendants reported an additional two warrantless arrests. Pls.' Ex. 117(h) at 7. In total, Defendants reported thirteen warrantless arrests, though they also provided documentation for additional select individuals allegedly arrested pursuant to field warrants. During oral argument, Defendants represented that they produced documents related to approximately 25 warrantless arrests, but the Court has no evidence of those other disclosures. Tr. 256-57.

pursuant to both 8 U.S.C. § 1357(a)(2) and the Court's preliminary injunction order, to make and document their dual-probable cause assessment, noting the factual basis for finding probable cause of illegal immigration status and escape risk. Defendants provided Plaintiffs with either excerpted or completed I-213 forms describing the circumstances of the warrantless arrests. Pls.' Ex. 117(a)-(f), (h).

## FINDINGS OF FACT AND ANALYSIS

On September 18, 2026, and September 21, 2026, the Court presided over an evidentiary hearing to determine whether Defendants have violated the Court's preliminary injunction. The Court bases its factual findings and conclusions on both the evidence received and presented at the hearing and the evidence submitted from pre-hearing and post-hearing filings.

As explained below, the Court finds that ICE agents in the District of Oregon have continued to conduct warrantless arrests without adequately making and documenting the requisite particularized finding of escape risk. Defendants have also failed to comply with the Court's order to appropriately document and disclose warrantless arrests.

### I. Warrantless Arrests in Oregon Since February 2026

At the hearing, Plaintiffs called two witnesses who testified about the prevalence of ICE arrests in Oregon since February 2026. Amber Qureshi, co-director of the Deportation Data Project, testified that her organization uses data obtained directly from federal agencies, including ICE, to analyze immigration arrests. Tr. 36-37. As an initial matter, the Court finds Amber Qureshi's testimony to be both reliable and credible, based on the substantive, logical, and rational coherence of her testimony and on her demeanor while testifying. Ms. Quershi testified that, according to the data, 504 non-custodial ICE arrests occurred in Oregon between the Court's preliminary injunction and July 31, 2026. Tr. 46; Pls.' Ex. 102. The Deportation Data Project could not distinguish between warrant-based and warrantless non-custodial arrests based

on the information ICE provided. Tr. 47. However, in Ms. Qureshi's experience, non-custodial arrests are more likely than custodial arrests to occur without a warrant.[8] Tr. 47.

Alyssa Walker Keller's testimony supported the conclusion that ICE officers in Oregon have conducted warrantless arrests. As an initial matter, the Court finds Alyssa Walker Keller's testimony to be both reliable and credible, based on the substantive, logical, and rational coherence of her testimony and on her demeanor while testifying. This Court observed in the manner of her presentation at the hearing that she was authentically concerned with the reliability of PIRC reporting, and was committed to providing accurate and precise responses to questions. Calls reporting ICE arrests to Ms. Walker Keller's organization PIRC rose significantly in recent months. Pls.' Ex. 103 ¶¶ 9-10. When PIRC receives a call from a community member about an ICE detention, PIRC "typically wait[s]" until it identifies the detained individual, using the ICE detainee locator, before it formally tracks the call. Tr. 55, 60. PIRC tracked an increase in calls since the Court's injunction, from 15 calls in March 2026, to 92 calls in August 2026. Pls.' Ex. 103 ¶ 10. Ms. Walker Keller also described that "the majority of the reports have been of arrests happening after a traffic stop in the street or interaction at a local courthouse, or in public parking lots." *Id.* ¶ 9.

[8] Defendants declined to cross-examine Ms. Qureshi during the hearing, *see* Tr. 46-47, but Defendants later raised concerns about the reliability of the data in Ms. Qureshi's spreadsheet. Tr. 268. Defendants noted that some arrests appeared to occur in custodial settings, despite Ms. Qureshi's representation that the arrests were non-custodial arrests. Tr. 268. But each arrest's designation as custodial or non-custodial came from ICE itself. Pls.' Ex. 101 ¶ 5; *see id.* (qualifying that, "[l]ike all administrative data, [the dataset] may contain inaccuracies" but "in general it reflects the agency's own internal understanding of its operations"). While any possible inconsistencies in the data may reflect poorly on ICE's internal data tracking, the inconsistencies have no material bearing on Ms. Qureshi's credibility or the overall reliability of the substance of her testimony.

Defendants reported that only thirteen warrantless arrests occurred over the course of six months. Pls.' Ex. 117(a)-(f), 117(h). Considering both Ms. Qureshi and Ms. Walker Keller's testimony, the Court finds that ICE officers conducted significantly more than thirteen warrantless arrests in Oregon between February 2026 and August 2026. This conclusion is further substantiated by the Court's finding, explained below, that there is a high number of arrests executed without a valid arrest warrant, rendering those arrests warrantless.

## II. Testimony of Stops and Arrests

Notwithstanding the data presented by Ms. Qureshi and Ms. Walker Keller, the Court concludes that Defendants have inaccurately reported warrantless arrests in Oregon based on the testimonial accounts of individuals arrested. Plaintiffs presented testimony from four individuals whom ICE officers stopped or arrested in June and July 2026. The Court addresses each incident in turn.

### A. Arrest of H-D-G-H-

H-D-G-H- has lived in Medford, Oregon, since 2021.[9] Tr. 104. He works in construction. Tr. 104. In addition to testifying, he also submitted a declaration on file with the Court. Pls.' Ex. 110. As an initial matter, the Court finds H-D-G-H-'s testimony to be both reliable and credible, based on the substantive, logical, and rational coherence of his testimony and on his demeanor while testifying.

On the morning of July 26, 2026, H-D-G-H- and his friend bought fishing supplies from Wal-Mart, planning to spend the day at Emigrant Lake in Ashland, Oregon. Tr. 104-05. H-D-G-H-'s friend M-T-M- drove his vehicle, while H-D-G-H- rode in the passenger seat. Tr.

[9] H-D-G-H- testified that he spent six months in San Franscisco, California, but that he otherwise lived in Medford continuously since 2021. Tr. 104.

105; Pls.' Ex. 110 ¶ 3. As they headed out of the Wal-Mart parking lot, an ICE vehicle began following their car. Tr. 106.

ICE Deportation Officer J.G. testified that he and his partner, Supervisory Detention and Deportation Officer D.C., ran license plates at Wal-Mart until they found a car whose owner was unlawfully present in the United States. Tr. 151. Officer J.G. used the Field Communications Center ("FCC") to make this identification, which is a group of officers who communicate through Microsoft Teams to run information provided by field agents through law enforcement databases. Tr. 151.When M-T-M- exited Wal-Mart, Officer J.G. positively identified M-T-M- as the vehicle's owner based on photos sent by the FCC. Tr. 153. Officer J.G. testified that he and his partner received an electronic I-200 warrant for M-T-M-'s arrest from the FCC "too late," so the agents "had to follow" M-T-M-'s car to Emigrant Lake. Tr. 152-53.

H-D-G-H- testified that he and M-T-M- continued driving to Emigrant Lake, and the ICE vehicle followed them for nearly half an hour. Tr. 106; Pls.' Ex. 110 ¶ 5. Once they arrived at the lake, the ICE vehicle pulled in front of their car and cut off their path. Tr. 107. After M-T-M- parked, Officer D.C. arrested M-T-M- pursuant to the electronic warrant received via Microsoft Teams. Tr. 156-57. At this point, stories diverge.

According to H-D-G-H-, one of the agents directed H-D-G-H- to step out of the car, then the agent immediately handcuffed him, and placed him in the ICE vehicle. Tr. 108. The agent did not ask for H-D-G-H-'s name and showed no documents to H-D-G-H- before taking him to the Medford ICE Office. Tr. 108; Pls.' Ex. 110 ¶ 7. At the office, ICE agents tried to make H-D-G-H- sign voluntarily deportation paperwork in exchange for money, but he refused. Tr. 111; Pls.' Ex. 110 ¶ 9. Officers ultimately released H-D-G-H- pursuant to a federal judge's order. Pls.' Ex. 110 ¶ 12.

According to Officer J.G., Officer D.C. spoke with H-D-G-H- in Spanish and learned his name, birthday, and citizenship. Tr. 158-59. Officer J.G. testified that Officer D.C. called another Supervisory Detention and Deportation Officer, who purportedly confirmed H-D-G-H-'s identity. Tr. 160. Then Officer D.C. filled out a pre-printed I-200 form in his ICE vehicle, and they arrested H-D-G-H-.[10] Tr. 160, 178.

Based on the substance of H-D-G-H-'s testimony and his demeanor, the Court finds that H-D-G-H-'s account is credible and that Officer J.G.'s testimony is false. H-D-G-H- testified that the encounter with ICE occurred "very quickly" and that approximately one minute passed before officers handcuffed him. Tr. 112-13. He stated that he did not speak to officers at all during the encounter and that he was frightened. Pls.' Ex. 110 ¶ 7; Tr. 108. Moreover, the Court finds Officer J.G.'s testimony to be highly doubtful in light of his false statements in his I-213 narrative for H-D-G-H-'s arrest.

The I-213 for H-D-G-H-'s arrest describes a series of events that Officer J.G. now admits never occurred.[11] The narrative in H-D-G-H-'s I-213 states the following:

> ENCOUNTER: On July 26, 2026, the arrest team conducted a targeted enforcement operation in Medford, OR. During the operation, the arrest team identified [H-D-G-H-]. DHS system queries revealed that [H-D-G-H-] is a citizen and national of Guatemala with no pending or approved immigration applications

[10] Officers D.C. and J.G. handwrote some sections of the I-200 form completed for H-D-G-H-. Tr. 170-71; Pls.' Ex. 113. However, the form also included a pre-printed probable cause determination and pre-printed name of authorized immigration officer. Pls.' Ex. 113. Specifically, the form pre-selected that Officer D.C. had probable cause to believe that an individual is removable "based upon…statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law." *Id.* Officer J.G. testified that Supervisory Detention and Deportation Officer D.C. keeps blank, pre-printed I-200 forms in his vehicle. Tr. 168-69.

[11] Defendants did not proactively, or upon request, provide Plaintiffs with any documentation related to H-D-G-H-'s arrest, contending that H-D-G-H- was arrested pursuant to a "warrant[] issued before the arrest." Pls.' Ex. 117(g) at 6; Pls.' Ex. 117(h) at 19. However, Plaintiffs submitted H-D-G-H-'s copy of his I-213 form, I-200 form, and Notice to Appear form. Pls.' Exs. 112-14.

> permitting him to remain in the United States. Based on this information, an ERO field supervisor issued a Warrant of Arrest of Alien (Form I-200) for [H-D-G-H-]. ERO Medford initiated an investigation to locate and apprehend him. DHS investigations also indicated that [H-D-G-H-] is a passenger in a grey Honda CR-V.
>
> ARREST: On July 26, 2026, at approximately 0707 hours, the arrest team observed a subject matching [H-D-G-H-]'s description as a passenger in a grey Honda CR-V from north Medford Wal-Mart. The team followed the vehicle to Lake Emigrant in Ashland, Oregon. The vehicle came to a complete stop while attempting to locate a parking space.
>
> The arrest team approached both the driver's and passenger's sides of the Honda CR-V, wearing agency-issued ballistic vests labeled "ICE" and "POLICE." The arrest team positively identified [H-D-G-H-] and identified themselves as immigration officers. The arrest team asked [H-D-G-H-] to step out of the vehicle and stated he had a warrant for his arrest. [H-D-G-H-] complied without incident. The arrest team stated again they were immigration officers and that [H-D-G-H-] was under arrest for being here illegally. ERO Medford arresting officers placed [H-D-G-H-] into handcuffs, double-locked and checked for proper fit. [H-D-G-H.]'s driver identification is [M-T-M-] a citizen of Mexico.

Pls.' Ex. 112 at 2. Officer J.G.'s electronic signature is applied to each page of this I-213.

But on the stand, Officer J.G. admitted that the narrative in the I-213 describing H-D-G-H-'s arrest was inaccurate. Officer J.G. testified that when he wrote the I-213, he "wrote [it] as if I was—if I already knew who the person was, but I did not." Tr. 162. He explained that he had already written the narrative for M-T-M-'s arrest, and he "pretty much wrote [M-T-M-'s I-213] the same" as H-D-G-H-'s I-213, but "made the mistake of not correcting" the copy. Tr. 163. While the I-213 states that Officer J.G. and his partner acquired a warrant for H-D-G-H- *before* approaching the stopped vehicle, Officer J.G. testified that he "did not have a warrant at the time" for H-D-G-H- and "did not even know [H-D-G-H-] existed" when officers stopped M-T-M-'s car. Tr. 163. Officer J.G. and his partner could not have "observed a subject matching [H-D-G-H-]'s description" or "positively identified" H-D-G-H- because the officers had no clue who he was when they first encountered him.

It defies logic that such consequential errors in the I-213 form are merely a "mistake." Officer J.G. was a sworn police officer for several years before becoming an ICE agent. Tr. 138.

On the stand he recounted the details necessary for obtaining search warrants and arrest warrants as well as the information needed for affidavits in criminal complaints. Tr. 179-82. Officer J.G. is well-versed in law enforcement practices. This Court finds that he did not make a mistake in the I-213. He lied in an official record to facilitate the impression he was conducting a lawful warrant-based arrest. The I-213 form that Officer J.G. crafted for H-D-G-H- demonstrates intentional, coordinated falsification that would in all likelihood never have been uncovered but for this evidentiary hearing. Evidentiary hearings are essential tools to ensure that a rigorous record of something closer to the truth is preserved, and to hold liars to account.

On the witness stand, Officer J.G. attempted to argue that, despite the false narrative in the I-213, he lawfully arrested H-D-G-H- pursuant to a warrant issued in the field. Tr. 160-61. The Court gives no weight to this account. H-D-G-H- testified that officers showed him no documents at the time of his arrest. Tr. 108. He only received documents from ICE officers *after* his release from custody, including an I-200 form, a Notice to Appear, and an Interim Notice Authorizing Parole. Tr. 109-110; Pls.' Exs. 113-15. Though Plaintiffs submitted a copy of the I-200 form that H-D-G-H- received from ICE, nothing on the I-200 indicates when it was issued or served in relation to H-D-G-H-'s arrest. Pls.' Ex. 113. However, based on evidence that ICE officers did not serve H-D-G-H-'s Notice to Appear until *two days after* his arrest, *see* Pls.' Ex. 114 at 3, the Court does not credit Officer J.G.'s testimony that officers completed and served an I-200 before H-D-G-H-'s arrest. ICE arrested H-D-G-H- without a warrant.

The evidence here clearly establishes ICE officers did not conduct an arrest pursuant to a *valid* warrant. Initially, Officer J.G. testified that he did not issue or serve a Notice to Appear on H-D-G-H- at the time of his arrest; the Notice to Appear was not even completed by the time ICE began transporting H-D-G-H- to Tacoma, Washington. Tr. 177. ICE did not serve a Notice

to Appear on H-D-G-H- until July 28, 2026. Tr. 178; Pls.' Ex. 114 at 3. For that reason alone, ICE did not conduct a lawful warrant-based arrest. *See* 8 C.F.R. § 236.1(b)(1) (requiring issuance of administrative warrants either concurrently with or after Notices to Appear). Additionally, Officer J.G. described how his partner, Officer D.C., personally filled out the I-200 arrest warrant for H-D-G-H-. Tr. 158-60. As Officer D.C. himself directed the investigation of H-D-G-H-, he hardly qualifies as an independent executive official qualified to issue a warrant. Simply put, even under Officer J.G.'s uncredible account, ICE officers failed to issue a timely Notice to Appear and failed to use an independent official to issue the arrest warrant. The only document to substantiate ICE officers' probable cause findings, the I-213 form, consists of Officer J.G.'s false statements. Procedurally and substantively, the purported warrant is grossly defective.

Since ICE officers did not arrest H-D-G-H- pursuant to a warrant, the Court analyzes his arrest as a warrantless arrest. Given its false content, the I-213 form provides no useful information about Officer J.G.'s probable cause assessment of H-D-G-H-'s immigration status or likelihood of escape. And at no relevant time before the time of taking H-D-G-H- into custody did Officer J.G. assert that he had a reason to believe H-D-G-H- posed an escape risk.

There is no doubt Defendants conducted an unlawful warrantless arrest of H-D-G-H- in violation of the Court's preliminary injunction order. H-D-G-H- is deemed a member of the Unassessed Escape Risk Subclass.

### B. Arrest of J-C-C-V-

J-C-C-V- has lived in The Dalles, Oregon for a year and a half. Tr. 63. He lives with his wife and two children, and he also has a brother, sister-in-law, and nephew in the United States. Pls.' Ex. 104 ¶ 2; Tr. 65. At the evidentiary hearing, he affirmed as true his declaration on file with the Court. Tr. 63. The Court finds J-C-C-V- to be credible based on the content of his testimony and his demeanor.

J-C-C-V- came to the United States over three years ago, in April 2023. Tr. 63. He previously received Temporary Protective Status from the government, up until his status was terminated last year. Tr. 64. He currently has a pending application for asylum, and he has authorization to work in the United States. Tr. 64; Pls.' Ex. 104 ¶ 2. He works for several delivery services, including Wal-Mart. Tr. 66.

On the morning of June 19, 2026, J-C-C-V- began his workday making Wal-Mart deliveries in Hood River. Tr. 66-67. He drove his Toyota Corolla to the Wal-Mart parking lot, where he waited to receive delivery orders. Pls.' Ex. 104 ¶ 3. J-C-C-V-'s brother, who also completed delivery services through Wal-Mart, waited in the same lot that morning, driving a Toyota Camry. *Id*.

J-C-C-V received an order and left the parking lot, but while completing a delivery, several ICE vehicles surrounded him and stopped his car. Tr. 67. Approximately six ICE agents approached J-C-C-V-, instructed him to get out of the car, handcuffed him immediately, and placed him in an ICE vehicle. Tr. 68; Pls.' Ex. 104 ¶ 5. The agents did not ask J-C-C-V- any questions, show him any paperwork, or declare they had a warrant. Tr. 68; Pls.' Ex. 104 ¶ 4.

Only after the agents drove off with J-C-C-V- did they begin asking him questions and checking his wallet for identification. Pls.' Ex. 104 ¶ 6. ICE agents first drove J-C-C-V- to a location near Cascade Rock by the train tracks, where J-C-C-V- stayed for approximately two hours while agents examined his identification card and spoke among themselves outside the car. Pls.' Ex. 104 ¶ 6; Tr. 68-69. J-C-C-V- informed the agents of his name and his open asylum case. Pls.' Ex. 104 ¶ 6. The agents did not release him. *Id.*

Instead, the agents drove J-C-C-V- to Portland, where they parked in a secluded construction lot for two more hours. Tr. 70-71; Pls.' Ex. 104 ¶ 7. When another ICE vehicle

drove up, an agent took paperwork from the car and forced J-C-C-V- to sign it, without explaining what the paperwork was. Tr. 71; Pls.' Ex. 104 ¶ 8. After he signed the paperwork, agents drove J-C-C-V- to the detention center in Tacoma. Tr. 73. J-C-C-V- remained detained in Tacoma until September 10, 2026, when Judge Chun in the Western District of Washington granted J-C-C-V-'s petition for writ of habeas corpus. Tr. 73; Pls.' Ex. 105.

During J-C-C-V-'s detention in Tacoma, ICE agents gave him a copy of his I-213 form. Tr. 74. J-C-C-V- submitted a copy of the form to the Court at the evidentiary hearing. Pls.' Ex. 106. Agents described J-C-C-V-'s vehicle incorrectly in the I-213—the paperwork erroneously documented that he drove a Toyota Camry, and it listed the wrong license plate for his car. Pls.' Ex. 104 ¶ 10; Tr. 74; Pls.' Ex. 106 at 2. Rather, the information on the I-213 matched the vehicle of J-C-C-V-'s brother. Tr. 74-75; Pls.' Ex. 104 ¶ 11. The I-213 also misstated the location of arrest, incorrectly identifying the location of the arrest as at or near Napa, California, rather than Hood River, Oregon.[12] Pls.' Ex. 106 at 2.

Defendants offered no testimony to contradict J-C-C-V-'s account. Instead, Defendants summarily argued that ICE agents were justified in arresting J-C-C-V- pursuant to an April 2023 arrest warrant. Defs.' Ex. 502. This argument is unavailing and patently contrary to law. Initially, in their required document disclosures, Defendants provided Plaintiffs with documentation for J-C-C-V-'s arrest on June 19, 2026, and apparently characterized his arrest as warrantless. Pls.' Ex. 117(h) at 7, 17-18. Only now do Defendants maintain that the three-year-old warrant provided a legal basis for J-C-C-V-'s rearrest in 2026.

[12] Defendants did not proactively disclose this I-213 to Plaintiffs. Instead, Plaintiffs made an individual request for documentation related to J-C-C-V-'s arrest. Pls.' Ex. 117(g) at 4. Defendants disclosed the I-213 narrative to Plaintiffs, but the documentation from Defendants lists J-C-C-V-'s arrest as occurring at or near Hood River, not Napa. Pls.' Ex. 117(h) at 17.

The 2023 warrant states that an ICE officer served the warrant on J-C-C-V- in McAllen, Texas, on April 25, 2023. Defs.' Ex. 502. ICE detained J-C-C-V- for eight days in 2023. Tr. 72, 186-87. Now, Defendants contend that the same warrant would have permitted officers to rearrest J-C-C-V- in 2026. Under 8 U.S.C. § 1226(b), the Attorney General can rearrest individuals based on previously executed warrants. However, a key detail Defendants ignore is the Attorney General must first "revoke a bond or parole" before rearresting. 8 U.S.C. § 1226(b). Defendants presented no evidence of revocation. Instead, Defendants argue through their counsel, that the I-213 form for J-C-C-V- "indicates there was an intention to revoke the bond or parole." Tr. 250. Intention does not constitute revocation, and the Court admonishes counsel that they are expected to make good faith arguments as officers of the court. Real people's lives and liberties are at stake and they should remember that. Evidentiary hearings are not first-year law school examinations where one can score points with a scattershot strategy.

Defendants presented no evidence that ICE agents were even *aware* of any prior warrant when they arrested J-C-C-V- on June 19, 2026. Instead, J-C-C-V- credibly testified that agents never told him that he was under arrest for immigration violations, and it is undisputed that agents drafted a *new* I-200 warrant for his arrest on June 19, 2026.[13] Tr. 77; Pls.' Ex. 107. Evidence of a newly drafted arrest warrant establishes that ICE officers, at the time of J-C-C-V-'s arrest, did not believe that they arrested J-C-C-V- on the basis of a warrant from 2023. Even the I-213 for J-C-C-V- indicates that officers only served an I-200 arrest warrant on J-C-C-V- "[d]uring processing." Pls.' Ex. 106 at 2. Moreover, there is no evidence ICE agents timely issued a Notice to Appear, which is itself fatal to Defendants' argument.

[13] The new warrant does not include a certificate of service on J-C-C-V-, but it is signed by an authorized immigration officer. Pls.' Ex. 107.

Defendants presented no credible evidence of a valid warrant for J-C-C-V-, nor did they present evidence of revoked bond or parole. J-C-C-V-'s arrest was warrantless, just as Defendants themselves first maintained in the documentation they produced to Plaintiffs before the evidentiary hearing.

J-C-C-V-'s testimony indicates the ICE agents did not engage in any discussion to determine his escape risk. There is no reference in the I-213 for J-C-C-V- that ICE agents had any reason to believe that J-C-C-V- posed an escape risk prior to executing his arrest. Defendants conducted an unlawful warrantless arrest of J-C-C-V- in violation of the Court's preliminary injunction order. J-C-C-V- is deemed a member of the Unassessed Escape Risk Subclass.

**C. Arrest of H-F-M-J-**

H-F-M-J- has lived in the United States for over three years, and in Eugene, Oregon for one year. Tr. 89; Pls.' Ex. 108 ¶ 2. He has several family members in Eugene, and he works as a landscaper and a dishwasher to support his three minor children. Tr. 89-90; Pls.' Ex. 108 ¶ 2. At the evidentiary hearing, he affirmed as true his declaration on file with the Court. Tr. 89. The Court finds H-F-M-J- to be credible based on the content of his testimony and his demeanor.

On the morning of July 3, 2026, H-F-M-J- left his home to go to work, driving a car that his family member loaned him several months before. Tr. 91-92. He gave a ride to his coworker. Pls.' Ex. 108 ¶ 3. While driving, H-F-M-J- noticed three dark-colored vehicles driving behind him. Tr 92. When he pulled into his workplace parking lot, the vehicles surrounded him. Tr. 92. Three ICE officers approached H-F-M-J-'s car wearing masks. Pls.' Ex. 108 ¶ 4. One officer instructed H-F-M-J- to get out of the car, declaring that the officers had an arrest warrant. Pls.' Ex. 108 ¶ 4; Tr. 93. H-F-M-J- followed their instructions. Tr. 94. Officers asked H-F-M-J- whether he had paperwork to permit him to be in the United States—a decidedly separate question from whether H-F-M-J- was legally in the United States. Tr. 95; Pls.' Ex. 108 ¶ 5. H-F-

M-J- denied having paperwork. Tr. 95; Pls.' Ex. 108 ¶ 5. Officers then handcuffed H-F-M-J-, arresting him and placing him in an ICE vehicle. Pls.' Ex. 108 ¶ 5. At no point prior to his arrest did officers ask H-F-M-J- for his name or show him any warrant. Tr. 94. Agents also arrested H-F-M-J-'s coworker, and they transported both men to the Eugene ICE Office. Tr. 94-95.

At the ICE Office, agents told H-F-M-J- to sign a form to avoid prolonged detention and to receive $2500. Tr. 95-96. H-F-M-J- signed the document without understanding it, as officers only gave him an English copy. Tr. 96. After he signed, an ICE officer informed him that he had signed a voluntary deportation form. Tr. 96. H-F-M-J- testified that he would not have signed the document if he knew what it was, but he felt pressured by the ICE agents to sign it. Tr. 97; Pls.' Ex. 108 ¶ 7. Following his arrest, H-F-M-J-'s attorney filed a petition for habeas corpus, and a federal judge ordered his release that same day. Pls.' Ex. 108 ¶ 8; Pls.' Ex. 109. He now reports weekly to ICE. Tr. 97-98.

Defendants did not proactively produce any documentation related to H-F-M-J-'s arrest. Only upon Plaintiffs' individual demand did they disclose the I-213 narrative describing the arrest. Pls.' Ex. 117(g) at 4; Pls.' Ex. 117(h) at 11-13. In their disclosure, however, Defendants maintained that ICE officers arrested H-F-M-J- pursuant to a field warrant. Pls.' Ex. 117(h) at 7. Defendants offered no testimony to support the assertion that officers issued a field warrant or to discredit H-F-M-J-'s account.

The I-213 narrative differs significantly from H-F-M-J-'s own testimonial account. According to the I-213, officers questioned H-F-M-J- at his car, quickly identified him, issued a field warrant for his arrest, and arrested him. Pls. Ex. 117(h) at 12. Initially, the Court notes that the I-213 narratives for H-F-M-J- and for his arrested coworker A-V-L- are nearly identical. In

both I-213s, officers claim to promptly identify the arrestees and their backgrounds "[u]pon questioning." Pls.' Ex. 117(h) at 12, 15. The I-213 for H-F-M-J describes the following:

> [H-F-M-J-] stated that he was a citizen and national of Mexico, born in Oaxaca. [H-F-M-J-] stated that he last entered the United States illegally on or about January 2022, at or near San Ysidro, California without having been admitted or inspected by an immigration officer. [H-F-M-J-] stated that he did not possess any legal immigration documents that would allow him to enter or remain lawfully in the United States. It was determined that [H-F-M-J-] was not the registered owner of the vehicle and an I-200 Arrest Warrant was issued for [H-F-M-J-]. [H-F-M-J-] was then arrested on the warrant and taken into ICE custody without incident and transported to the Eugne [sic] ERO office for processing.

Pls.' Ex. 117(h) at 12. The I-213 for A-V-L- provides a strikingly similar account:

> [A-V-L] stated that he was a citizen and national of Mexico, born in Oaxaca. [A-V-L-] stated that he last entered the United States illegally on or about January 2021, at or near San Ysidro, California without having been admitted or inspected by an immigration officer. [A-V-L-] stated that he did not possess any legal immigration documents that would allow him to enter or remain lawfully in the United States. It was determined that [A-V-L-] was not the registered owner and an I-200 Arrest Warrant was issued for [A-V-L-]. [A-V-L-] was then taken into ICE custody without incident and transported to the Eugne [sic] ERO office for processing.

Pls.' Ex. 117(h) at 15. Though the Court recognizes that arrests during the same ICE encounter may lend themselves to similar I-213 narratives, the Court is skeptical that both H-F-M-J- and A-V-L- provided such identical information so promptly, particularly in light of H-F-M-J-'s credible testimony that he never even provided ICE officers with his name before officers arrested him. Tr. 94.

Defendants give this Court no reason to credit the I-213's statement over H-F-M-J-'s testimony. Instead, the barebone, repetitive nature of the I-213—especially given the confirmed false statements present in other I-213s before this Court—indicates that the I-213 is not reliable. There is additionally, as in other people's arrests described in this Opinion, no evidence ICE

agents issued a timely Notice to Appear, as required upon the issuance of any administrative warrant. ICE officers did not arrest H-F-M-J- pursuant to a valid warrant.

Since ICE officers did not arrest H-F-M-J- pursuant to a valid arrest warrant, the Court analyzes his arrest as warrantless. There is no evidence in this record that ICE agents conducted any assessment of escape risk or had any reason to believe that H-F-M-J- posed an escape risk prior to effecting his arrest.

Defendants conducted an unlawful warrantless arrest of H-F-M-J- in violation of the Court's preliminary injunction order. H-F-M-J- is deemed a member of the Unassessed Escape Risk Subclass.

**D. Investigatory Stop of C-J-V-M-**

C-J-V-M- has lived in Medford, Oregon, for two years with his wife and daughters. Tr. 125. He has a pending asylum application, and he reports to ICE as required. Tr. 126. On the morning of June 13, 2026, C-J-V-M- drove his family member's car to McDonalds for work. Pls.' Ex. 116 ¶ 6; Tr. 130. When he parked in the lot, four ICE vehicles surrounded his car. Tr. 127-28. ICE agents approached his window, and C-J-V-M- reached to grab his phone to record the interaction. Tr. 128. Agents began to shout for C-J-V-M- to exit the vehicle, asserting that they had a warrant for his arrest. Tr. 128. When C-J-V-M- did not exit, an agent broke his window and pulled C-J-V-M- out of the car. Tr. 129. Agents handcuffed him and took his ID. Tr. 129. After a few minutes, agents informed C-J-V-M- that they had made a mistake, and they let him go. Tr. 130; Pls.' Ex. 116 ¶ 11.

Officer J.G. testified that ICE agents intended to arrest the owner of C-J-V-M-'s car, not C-J-V-M-. Tr. 142. Agents ran the car's plates, learned that the owner had a final order of deportation, and acquired a warrant for the owner's arrest prior to surrounding the car. Tr. 141-42. When C-J-V-M- parked the car, Officer J.G. approached the driver's side and asked C-J-V-

M- to roll down the window. Tr. 143-44. Upon seeing C-J-V-M- reach for something across the seat, Officer. J.G. broke the car window and pulled C-J-V-M- out. Tr. 145-46. Once Officer J.G. saw C-J-V-M- clearly, he realized that C-J-V-M- was not ICE's intended target. Tr. 147.

This encounter does not constitute an unlawful arrest. ICE officers had reasonable suspicion to stop the car based on running its license plate, identifying the car's owner, and executing a warrant for the owner. When Officer J.G. saw C-J-V-M- reach for an unidentified object, Officer J.G. broke the car window to pull out C-J-V-M- and temporarily detain him out of concern for officer safety. ICE agents released C-J-V-M- when they determined he was not the target of the investigation.

## III. Documentation and Disclosures of ICE Arrests

Finally, the Court reviewed warrantless arrest documentation that Defendants provided to Plaintiffs. Pls.' Ex. 117 ¶¶ 2-9. Pursuant to the preliminary injunction order, Defendants provided documentation every thirty days describing the warrantless civil immigration arrests that occurred in the District of Oregon. *Id.*; Order at 3, ECF No. 82. The Court finds that Defendants have failed to properly document warrantless arrests.

In their monthly reporting across six months, Defendants sent Plaintiffs documentation related to eleven warrantless arrests. Pls.' Ex. 117(a)-(f). Defendants additionally provided documentation for three arrests that Defendants claimed to be arrests pursuant to warrants issued in the field. Pls.' Ex. 117(c)-(e). Outside of monthly reporting, Plaintiffs requested documentation related to 38 additional arrests that Plaintiffs believed were warrantless.[14] Pls.' Ex. 117(g). Pursuant to Plaintiffs' request, Defendants provided information for two additional warrantless arrests. Pls.' Ex. 117(h) at 8-10, 17-18. However, Defendants contend that all other

[14] Plaintiffs requested information on 39 individuals, with one duplicated request. Pls.' Ex. 117(g).

individuals for whom Plaintiffs demanded records were arrested with warrants and therefore not subject to the Court's disclosure order.[15] Pls.' Ex. 117(h) at 1, 6, 7, 19.

In total, Defendants disclosed documentation related to thirteen warrantless arrests and five arrests alleged to be arrests pursuant to field warrants. Eleven of the thirteen reported warrantless arrests occurred during a vehicle stop. Pls.' Ex. 117(b) at 2-9; Pls.' Ex. 117(d) at 5-11; Pls.' Ex. 117(e) at 5-16; Pls.' Ex. 117(f) at 2-4; Pls.' Ex. 117(h) at 8-10, 17-18. The remaining two warrantless arrests occurred during Homeland Security and FBI investigations. Pls.' Ex. 117(f) at 5-11. Every field warrant reported by Defendants occurred during a vehicle stop. Pls.' Ex. 117(c) at 2-4; Pls.' Ex. 117(d) at 2-4; Pls.' Ex. 117(e) at 2-4; Pls.' Ex. 117(h) at 11-16. The Court also considered H-D-G-H-'s I-213 form, which Plaintiffs provided to the Court but which Defendants did not produce. Pls.' Ex. 112.

Defendants' documentation presents a number of problems for their contention that they are complying with this Court's preliminary injunction order. These produced documents, as scant a sampling size as it is, reveal Defendants' falsification of I-213s, misstatements of material facts when evaluated against credible testimony under oath, use of boilerplate language that casts significant doubt on ICE agents' meaningful investigation of necessary facts, and perhaps the least of the worst transgressions, sloppiness.

### A. Failure to Perform and Document Individualized Determinations

Defendants' documentation demonstrates that ICE agents in Oregon repeatedly fail to conduct individualized assessments of escape risk. The boilerplate, vague, and generalized

[15] Following Plaintiffs' requests, Defendants also provided information for three individuals while maintaining they were arrested pursuant to field warrants. Pls.' Ex. 117(h) at 1, 7. One of these arrests had previously been disclosed as an arrest pursuant to a field warrant in Defendants' monthly reporting. *See* Pls.' Ex. 117(h) at 3 (arrest of J-C-S-M-); Pls.' Ex. 117(c) at 2 (same).

language used in Defendants' I-213s does not comply with the Court's preliminary injunction order.

1. Boilerplate Language in Documentation

ICE officers often justified the warrantless arrests in Oregon using boilerplate language that lacked sufficient individualized determinations of the factors contributing to likelihood of escape. Boilerplate language is standardized, formulaic text reused across arrest documents. Boilerplate language, by definition, fails to account for the unique facts of an arrest and strongly indicates that ICE officers are not conducting individualized probable cause assessments. The Court emphasized the inadequacy of boilerplate phrases in its preliminary injunction order, informing Defendants that "use of boilerplate language may be deemed indicative of noncompliance." Order at 49, ECF No. 88.

Across the board, Defendants' documentation reflected significant boilerplate text used by ICE agents to justify a finding of escape risk, particularly for vehicular arrests. For example, for J-L-S-G-'s arrest on June 30, 2026, ICE agents recorded: "A warrantless arrest was conducted, at the time of arrest ERO Officers were unaware if the SUBJECT had any ties to the community, the arrest occurred on a public street, the SUBJECT was encountered in a vehicle likely to escape before a warrant could be issued." Pls.' Ex. 117(e) at 9. For J-C-T-C-'s arrest on June 28, 2026, ICE agents used this exact phrase again but replaced the location with "in a public parking lot." Pls.' Ex. 117(e) at 15. For M-A-F-G-'s arrest on July 19, 2026, ICE agents repeated this phrase but replaced "SUBJECT" with the individual's name Pls.' Ex. 117(f) at 3. For E-E-C-V-'s arrest on June 10, 2026, ICE agents again used the same phrase but switched the order of the clauses, noting first that the arrest "occurred on a public roadway" and then that officers "were not aware if subject had any ties to the community" and that "the SUBJECT was

encountered in an operational vehicle likely to escape before a warrant could be obtained." Pls.' Ex. 117(e) at 6. ICE agents' boilerplate repetition of their "unawareness" of community ties is a clear example of their failure to conduct simple law enforcement investigative duties. This is sloppy work.

Defendants contend that such repetition is to be expected in factually similar arrest situations, like vehicle stops, and that "[t]he commonality of the facts does not invalidate the legitimacy of the officers' probable cause." Defs.' Resp. at 9, ECF No. 144. This Court appreciates that similarities may arise in ICE arrests involving cars, vehicle stops, roadways, and parking lots. But these similarities do not eliminate ICE investigators' obligation to conduct *individualized* assessments of the circumstances. Vehicle stops may be similar, but they are not identical. The Court's preliminary injunction order required Defendants to document "specific, particularized facts" supporting the escape risk analysis, including an individual's "ties to the community, if known at the time of arrest, including family, home, or employment." Order at 49, ECF No. 88. Facts are not sufficiently particularized when Defendants give the same formulaic assertions to justify warrantless arrests during vehicle stops.

The Court finds that such boilerplate language across I-213s strongly indicates that ICE officers are not conducting the necessary individualized investigations into escape risk, in violation of the Court's preliminary injunction order.

2. Vagueness in Documentation

For arrests without boilerplate escape risk findings, Defendants often provided only vague and insufficient analysis of escape risk in their reports. For example, officers justified one warrantless arrest based on the individual's "lack of community ties and the circumstances observed." Pls.' Ex. 117(e) at 12. The officer's report provided no explanation of why the "circumstances" justified finding a likelihood of escape, nor did the report explain how the

officer concluded that the individual lacked community ties. In fact, the report later contradicts this finding, describing that the individual has two children who are U.S. citizens, one of whom serves in the U.S. Marine Corps. *Id.* at 12-13. This Court is hard pressed to find more compelling evidence of community ties than a parent's success in raising a child who is willing to defend their community and this country. The ICE agents' disregard for this compelling community tie is far worse than mere sloppiness—it is a gross disregard for the willingness of people from all backgrounds to make sacrifices for our country.

Similarly, during an ICE-initiated vehicle stop, officers justified D-G-M-'s likelihood of escape based on "the ready access to a mobile conveyance, the location of the traffic stop, and the behavior exhibited by [D-G-M-]." Pls.' Ex. 117(d) at 9. Yet in the I-213 paperwork, ICE agents provided no description of D-G-M-'s behavior at all or why his behavior created probable cause of escape risk; officers simply noted that D-G-M- responded to the officers' questions "in broken English." *Id.*

In two cases, ICE officers described that the apprehended individual was already in another agency's custody, yet the officers nonetheless conducted a warrantless arrest. For example, ICE officers noted that they "encountered [E-R-S-] while in HSI custody" following a notification from Homeland Security Investigators. Pls.' Ex. 117(f) at 6. Despite finding E-R-S- in custody, ICE officers "made an individualized determination that he was likely to escape prior to obtaining a warrant." *Id.* at 7. Similarly, ICE officers encountered I-A-M-L- when she "was already detained by [the] FBI." Pls.' Ex. 117(f) at 10. Nonetheless, officers initiated a warrantless arrest, noting that "[t]he arrest occurred in a publicly accessible parking lot" and "ERO officers were not aware if SUBJECT had ties to the community at the time of arrest." *Id.*

The Court ordered that, for every warrantless arrest, Defendants must document "specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." Order at 49, ECF No. 88. The documentation Defendants provide are inadequately vague assessments of "circumstances," "behavior," and proximity to a vehicle, without providing more detailed facts individualized to the arrestee. The Court finds that these ambiguous and sparse explanations fall far below that which is minimally necessary to establish probable cause. The deficiencies are not only unlawful, but they violate the Court's preliminary injunction order.

3. Improper Legal Standard in Documentation

Not only have Defendants failed to make individualized assessments of probable cause, but Defendants' documentation also evidences that Defendants have considered patently incorrect factors when assessing escape risk. For example, two I-213 forms reveal that ICE officers incomprehensibly considered immigration status when analyzing likelihood of escape. During a vehicle stop, ICE arrested two brothers and drafted identical I-213 forms for them. Pls.' Ex. 117(b) at 4, 8. To justify probable cause for escape risk, both I-213 forms state: "With the immigration status of the two passengers, there is a high likelihood of them absconding because of their impending arrest and removal." *Id*. ICE cannot legally determine likelihood of escape on the basis of immigration status. Otherwise, the statutory requirement of assessing escape risk for warrantless civil immigration arrests would be utterly meaningless. Immigration status is rarely, if ever, an appropriate specific, particularized fact in these arrests. Using an inappropriate factor to bolster a probable cause finding of escape risk violates the Court's preliminary injunction order.

### B. Errors in Documentation

Defendants' documentation contains numerous substantive and consequential errors. For example, one report described that ICE Fugitive Operations issued an I-200 warrant for M-A-F-G- before approaching M-A-F-G- at his vehicle, yet it later provides a boilerplate explanation of escape risk and describes that "[a] warrantless arrest was conducted." Pls.' Ex. 117(f) at 3. Defendants reported this arrest as warrantless, *see* Pls.' Ex. 117(f) at 1, but the I-213 as written defies categorization. Another report falsely documented the location of arrest as on or near Wine Country Avenue in Napa, California, yet the arrest actually occurred on Country Club Road in Hood River, Oregon.[16] Pls.' Ex. 106 at 2.

The more insidious problems with Defendants' documentation are the errors not apparent on the face of the documents. For example, and as discussed above in greater detail, Officer J.G. testified during the evidentiary hearing that the I-213 for H-D-G-H- failed to accurately describe the circumstances of H-D-G-H-'s arrest. Tr. 163. Officer J.G. lied in the I-213 by copying the language that he wrote in the report for driver M-T-M-, the initial target of Officer J.G.'s investigation. Tr. 163; Pls.' Ex. 112. Anyone reading the I-213 for H-D-G-H- would believe that Officer J.G. had identified H-D-G-H- *before* conducting the investigatory stop, yet Officer J.G. admitted that he had no idea who H-D-G-H- was or that H-D-G-H- was even in the car until after the stop occurred. Tr. 163. Had this Court not conducted an evidentiary hearing, and had Officer

[16] Counsel for Defendants clarified during the hearing that I-213s can autopopulate to complete addresses, and "Wine Country Avenue, Hood River" mistakenly autopopulated to "Wine Country Avenue, Napa, California." Tr. 260-61. Notably, this typographical error does not appear on the documentation provided to Plaintiffs during monthly disclosures. Instead, the document describes the arrest as occurring at or near Hood River, suggesting that the documentation provided to Plaintiffs is incomplete or that the I-213 may have been edited after it was printed and provided to J-C-C-V-. *Compare* Pls.' Ex. 117(h) at 17, *with* Pls.' Ex. 106 at 2.

J.G. never testified, Officer J.G.'s falsification of H-D-G-H-'s I-213 form would have been left unchallenged and never corrected.

Similarly, the I-213 for J-C-C-V- describes that ICE apprehended him while driving a 2017 Toyota Camry, and listed the full license plate number for J-C-C-V-'s car. Pls.' Ex. 106 at 2; Pls.' Ex. 117(h) at 18. The description of both are just plain wrong. As J-C-C-V- stated in his declaration and affirmed on the stand, he drove his 2010 Toyota Corolla on the day of his arrest. Pls.' Ex. 104 ¶ 10. Instead, the car's description in the I-213 matches the car owned by J-C-C-V-'s brother—who, on the day of J-C-C-V-'s arrest, was in his 2017 Toyota Camry in the same Wal-Mart parking lot waiting for delivery orders. Tr. 74-75. This error, combined with the other circumstances of J-C-C-V-'s arrest discussed above, leads this Court to conclude ICE's incompetence targeted the wrong person. Appallingly, Defendants' incompetence extends far beyond tracking the wrong person. J-C-C-V- was detained for several months because of Defendants' errors. Tr. 73.

The Court finds that the documented errors in Defendants' I-213 narratives, particularly in light of Officer J.G.'s testimony admitting to including false information in at least one I-213, renders these documents unreliable for determining whether a warrantless arrest was valid. More damningly, these errors prove that, without external accountability or supervision, ICE is not capable or competent in conducting its investigative and enforcement activities with integrity.

### C. Field Warrants

Finally, Defendants contend that ICE officers made some arrests pursuant to field warrants, rendering such arrests valid and not warrantless. *See, e.g.*, Pls.' Ex. 117(d) at 1. Field warrants are, as the name suggests, warrants issued in the field after ICE officers encounter an individual who they believe is illegally present in the United States. Defendants produced documentation for five distinct field warrant arrests, ostensibly to show the Court that these

arrests fell outside the scope of the injunction. However, the I-213 narratives for several of these "field warrant" arrests illustrate Defendants' failure to follow the Court's order.

For example, Defendants disclosed arrest documents for J-C-B-L- while maintaining that officers arrested J-C-B-L- "pursuant to a warrant issued in the field." Pls.' Ex. 117(d) at 1. But the disclosed document makes clear that J-C-B-L-'s arrest was warrantless. The I-213 states clearly that "[b]ased on the totality of circumstances, to include his lack of ties to the community, officers on scene determined that [J-C-B-L-] was likely to escape before a warrant could be obtained." *Id*. at 4. Nothing in the I-213 narrative for J-C-B-L- indicates that ICE agents ever issued an arrest warrant for him. Instead, the report suggests that officers issued an I-200 arrest warrant for the *driver* of a vehicle, conducted a vehicle stop, then arrested *passenger* J-C-B-L- without a warrant. *Id*. at 3-4. There is no support for Defendants' assertion that J-C-B-L-'s arrest is warrant-based.

Defendants also contradicted their own categorization of arrests during litigation. Defendants provided Plaintiffs with an I-213 narrative for G-S-L-'s arrest, maintaining that G-S-L- "was arrested pursuant to a warrant issued in the field prior to arrest" and that "ICE does not concede" that G-S-L-'s was warrantless. Pls.' Ex. 117(e) at 1. However, the I-213 form belies this claim. According to the I-213 narrative, ICE officers believed G-S-L- was "likely to escape before a warrant could be issued," so agents arrested him and moved him to a secondary location for further investigation. Pls.' Ex. 117(e) at 3. After investigation, "[a]n I-200 Warrant for Arrest of Alien was drafted on scene and served promptly, [and G-S-L] was advised formally he was being placed under arrest for immigration violations by immigration officers." *Id*. Defendants disclosed this document to Plaintiffs while maintaining that this individual's arrest was not warrantless. But later, in its response to Plaintiff's motion, Defendants backtracked, conceding

that G-S-L-'s arrest was in fact warrantless but that a later-issued I-200 "does not invalidate the lawful warrantless arrest." Defs.' Resp. at 6, ECF No. 144. The problem, however, is that Defendants never reported G-S-L-'s arrest to Plaintiffs as a *warrantless* arrest as they are required to do every month pursuant to this Court's preliminary injunction order. Perhaps Defendants' confusion arose from the fact that nothing in the arrest narrative explicitly describes this arrest as warrantless, despite the Court's order to specifically document when an arrest is warrantless. Order at 49, ECF No. 88.

Defendants have repeatedly and improperly categorized warrantless arrests as arrests conducted pursuant to field warrants. As it stands, the Court has no way to know how many more warrantless arrests in the District of Oregon may still be undisclosed because of Defendants' failure to follow the law and this Court's preliminary injunction order. Given the Defendants' egregious conduct described in this Opinion and Order, the Court fears that Defendants' violations of the law and the Court's preliminary injunction order is far reaching.

## RELIEF ORDERED

### I. The Court has jurisdiction to enforce, clarify, and modify the preliminary injunction.

Defendants contend that the Court lacks jurisdiction to modify the preliminary injunction or to order the actions that Plaintiffs request.[17] Defs.' Resp. at 12-14, ECF No. 144. In

[17] Defendants rely on *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023), to argue that modification of the injunction in this case would be beyond the Court's power, given that Defendants appealed the injunction. Defs.' Resp. at 13, ECF No. 144. But that case is inapposite. In *Coinbase*, the Supreme Court held that district courts must stay pre-trial and trial proceedings while a motion to compel arbitration is pending appeal. 599 U.S. at 738. As the Supreme Court noted, this decision "reflects common sense," given that continuing the proceedings without addressing arbitrability "largely defeats the point of the appeal." *Id*. at 743 (citation omitted). Here, Federal Rule of Civil Procedure 62(d) explicitly provides the Court with power to "suspend, modify, restore, or grant an injunction" while the original, underlying injunction is on appeal. The Court can modify its prior injunction so long as "the changes preserve[] the status quo and [do] not materially alter the status of the case on appeal." *Southwest Marine*, 242 F.3d at 1166.

Defendants' view, Plaintiffs' requests "impermissibly extend to matters well beyond the basis of the existing injunction." *Id.* at 13. Defendants argue that the relief Plaintiffs seek does not "preserve the status quo," rendering it inappropriate under Federal Rule of Civil Procedure 62(d). *Id.* at 14 (quoting *McClatchy Newspapers v. Cent. Valley Typographical Union No. 46*, 686 F.2d 731, 734 (9th Cir. 1982)). Plaintiffs, however, contend that the relief sought will achieve the purpose of the Court's preliminary injunction. Pls.' Reply at 9, ECF No. 147.

In this case, the Court's preliminary injunction order maintained the status quo by ensuring that ICE and its officers follow the law for effecting warrantless arrests, by requiring Defendants to record the circumstances of warrantless arrests, and by allowing Plaintiffs access to Defendants' warrantless arrest documents to ensure compliance with the law. The Court has the power to supervise compliance and to clarify or modify its injunction to ensure the status quo remains intact during litigation. *See Meinhold*, 34 F.3d at 1480 n.14; *Hawaii*, 871 F.3d at 654. Here, Plaintiffs' motion to enforce the injunction aims to achieve that purpose in light of Defendants' repeated violations of the Court's order. The Court has inherent jurisdiction to enforce, clarify, and modify the preliminary injunction to appropriately address the "newly revealed facts or circumstances" of Defendants' violations. *United States v. Washington*, 853 F.3d at 979.

Of course, "[a]n injunction must be narrowly tailored to remedy the specific harm shown." *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (internal quotation marks omitted). The Court addresses each of Plaintiffs' requests for relief individually and in the factual context presented.

## II. Plaintiffs are entitled to relief.

Defendants have routinely violated the terms of the Court's preliminary injunction order. ICE has continued to conduct warrantless arrests without individualized, pre-arrest probable cause determinations. In at least one incident established in this record, an ICE agent admitted to falsifying agency records. Plaintiffs have more than met their burden of demonstrating Defendants' failure to conform their conduct with the law and comply with the Court's order. Plaintiffs are entitled to relief. Plaintiffs request five clarifying or additional orders from this Court, each addressed in turn below.

### A. Reliance on Lyons Memo

Plaintiffs request that the Court prohibit Defendants from relying on the Lyons memo. Pls.' Proposed Relief at 3, ECF No. 161. On January 28, 2026, ICE Director Todd Lyons issued a memorandum to all ICE personnel. Admin. Rec. at 2-6, ECF No. 117. The Lyons memo advises officers how to issue administrative warrants and conduct warrantless arrests. *Id*. at 3-4. Specifically, the memo distinguishes the statutory language "likely to escape" from the concept of "flight risk." *Id*. at 5-6. According to the memo, an individual is likely to escape "if an immigration officer determines he or she is unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained." *Id*. at 4. The memo outlines certain factors for officers to consider when assessing likelihood of escape, including a person's behavior prior to or during an encounter with ICE, a person's ability to "promptly depart the scene of the encounter," and a person's possession of work authorization documents, among other factors. *Id*.

Plaintiffs contend that the Lyons memo "is wholly inconsistent with this Court's preliminary injunction." Pls.' Reply at 5, ECF No. 147. Defendants assert that the memo "correctly explains how immigration officers should assess escape risk in conducting warrantless

arrests." Defs.' Resp. at 8, ECF No. 144. Other courts across the country have discussed the legality of the Lyons memo at length. *See, e.g.*, *Ovando v. Mullin*, No. 1:25-cv-03183-RBJ, 2026 U.S. Dist. LEXIS 203717, at *47-49 (D. Colo. May 12, 2026); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 832 F. Supp. 3d 22, 50 (D.D.C. 2026). However, the Court declines to opine on the Lyons memo at this juncture because it is unclear whether ICE officers in the District of Oregon have relied on the Lyons memo when conducting warrantless arrests. This requested relief is not allowed at this time, but the request may be renewed if evidence establishes ICE agents relied on the Lyons memo. The Court observes, however, that Defendants remain obligated to obey the law and this Court's preliminary injunction, and their conduct can be reviewed with or without the Lyons memo in play.

**B. Continuing Obligation to Transmit Order**

Plaintiffs request that the Court "[i]nstruct that Defendants have a continuing obligation to transmit the terms of the Preliminary Injunction order to their officers, employees, and contractors who have responsibility related to its content." Pls.' Proposed Relief at 3, ECF No. 161. While the preliminary injunction remains in place, ICE officers conducting warrantless arrests in the District of Oregon are obligated to follow the Court's order. Officers are unable to properly follow the Court's order if they do not know about the order. Given Defendants' repeated violations of the order, the Court concludes that clarification of Defendants' duty to transmit the order is necessary to enforce the preliminary injunction order. Defendants must retransmit the Court's order every thirty days, such that all officers, employees, and contractors who have responsibilities related to the subject matter of the injunction are continually apprised of their legal obligations in the District of Oregon. Defendants shall certify this retransmission every thirty days by filing notice with the Court.

**C. Re-production of Documentation Without Redactions**

Plaintiffs request that the Court order Defendants "to re-produce all previous compliance reporting without redaction." Pls.' Proposed Relief at 3, ECF No. 161. In the documents disclosed to Plaintiffs, Defendants redacted certain information, including license plate numbers, fingerprint scans, case numbers, names of third parties, and records checked upon arrest. *See* Pls.' Ex. 117(a)-(h). Plaintiffs argue that the Court's order does not permit Defendants to "arbitrarily redact information." Pls.' Reply at 6, ECF No. 147. Defendants offer no justification for the redactions in their response to Plaintiffs.

The Court's preliminary injunction order did not expressly permit or prohibit Defendants' redaction of disclosed documents. Based on Defendants' violations of the Court's order and failure to disclose documents to Plaintiffs, the Court has little confidence that Defendants' will comply with any instruction that would allow some redaction. The protective order in place in this case sufficiently shields the documents from inappropriate disclosure. *See* Protective Order, ECF No. 42. No redaction is ordered. Defendants must re-produce previously disclosed documentation for Plaintiffs without redaction and shall not redact documents provided to Plaintiffs going forward.

**D. Producing All Arrest Documents for Prior Reported Arrests**

Per the Court's preliminary injunction order, Defendants must disclose the facts and circumstances of warrantless civil immigration arrests "in narrative form." Order at 49, ECF No. 88. At the hearing for the preliminary injunction, the Court determined that Defendants must produce the I-213s, as those documents included individualized references to escape risk. *See* 02/04/2026 Tr. 211, ECF No. 84. However, the Court noted that if disclosure "becomes a problem" or "if there is some fundamental misunderstanding about the document," then modification of the preliminary injunction may be appropriate. *Id.*

Plaintiffs now request that the Court require Defendants to produce "all documents related to an arrest made by Defendants, including the corresponding Forms I-200, I-213, all documents served on the arrested individual, any evidence underlying the I-200 as described in the I-213 or referred to by the I-200 form itself, and all body worn camera footage of the arrest." Pls.' Proposed Relief at 3-4, ECF No. 161. The Court considers this modification to be necessary for several reasons.

First, Defendants have underreported warrantless arrests. From February 5, 2026, to July 31, 2026, Defendants' officers conducted 504 non-custodial arrests in the District of Oregon. Tr. 46-47. Defendants reported that only eleven of these arrests were warrantless arrests. Pls.' Ex. 117(a)-(f). However, Defendants later conceded that at least two more warrantless arrests occurred in that timeframe. Pls.' Ex. 117(h) at 7. As explained above, the Court also found that H-D-G-H- and H-F-M-J-'s arrests were warrantless, despite Defendants' contention that their arrests involved field warrants. Plaintiffs have shown that Defendants have simply failed to provide comprehensive records of warrantless arrests in Oregon under the current terms of the injunction.

Second, Plaintiffs' proposed modification supports the underlying purpose of the Court's preliminary injunction order. The Court issued the preliminary injunction order to ensure that Defendants conduct warrantless civil immigration arrests in accordance with the law, and to provide Plaintiffs with a mechanism for monitoring Defendants' compliance with the law. In February 2026 when the Court issued its order, the Court believed that disclosure of Defendants' I-213 narratives would be sufficient to meet these goals. But evidence of Defendants' poor recordkeeping has changed the Court's stance. The I-213 narratives produced by Defendants in this case have been boilerplate, vague, or outright fabricated. The I-213s often fail to clearly

distinguish warrantless and warrant-based arrests. As noted above, even Defendants themselves have struggled to identify whether an I-213 narrative describes a warrantless or warrant-based arrest. *Compare* Pls.' Ex. 117(e) at 1 (identifying G-S-L-'s arrest as warrant-based), *with* Defs.' Resp. at 5, ECF No. 144 (identifying G-S-L-'s arrest as warrantless). Plaintiffs need more documentation to determine whether ICE lawfully conducts warrantless civil immigration arrests in the District of Oregon and to effectively monitor Defendants' compliance with the Court's order. The I-213 narratives alone are inadequate.

Finally, the documents that Plaintiffs request will allow Plaintiffs and the Court to determine which arrests are warrantless, and whether Defendants conduct a pre-arrest assessment of likelihood of escape risk for warrantless arrests. Producing I-213s in full, rather than just the I-213 narratives, will ensure that Plaintiffs have access to comprehensive information about an arrest. Producing I-200s and documents served on arrested individuals will allow Plaintiffs to determine whether and when a valid warrant was in fact issued. Even if Defendants claim that an arrest occurred pursuant to a warrant, the additional documentation of that arrest is necessary to substantiate or contradict that assertion, especially given Defendants' extensive violations of the Court's preliminary injunction order.

Plaintiffs also request body worn camera footage of all arrests since the Court's injunction became effective or, if unavailable, a statement under oath that no footage exists. Pls.' Proposed Relief at 3-4, ECF No. 161. In light of the errors and falsehoods in the I-213 narratives, body worn camera footage will allow Plaintiffs to determine whether Defendants conducted a warrantless arrest and whether officers completed an individualized escape risk assessment for warrantless arrestees. However, Plaintiffs represent that body worn cameras only became fully available for ICE agents nationwide as of September 1, 2026. *See* Pls.' Reply at 14, ECF No.

147. Accordingly, the Court determines that Defendants need only produce body worn camera footage for arrests conducted on September 1, 2026, and onward.

Generally, Defendants argue that requiring them to produce documents for arrests conducted pursuant to warrants "would punish Defendants for conducting arrests with warrants instead of arrests without warrants and provide Plaintiffs with unchecked policing powers over immigration enforcement in Oregon." Defs.' Resp. at 12, ECF No. 144. Defendants' complaint is unavailing. Requiring Defendants to disclose documents that they already maintain does not punish Defendants because it requires no additional action from Defendants beyond disclosure. It merely provides Plaintiffs with needed information to determine whether Defendants are complying with the Court's order regarding warrantless arrests, particularly given Defendants' failure to properly disclose warrantless arrests. Plaintiffs also gain no "policing powers" from these documents; they only gain the ability to monitor Defendants' arrest conduct, which is appropriate given the record before this Court. Such disclosure might not be necessary if Defendants conducted and documented warrantless immigration arrests lawfully.

At the evidentiary hearing, Defendants repeatedly asserted that modifying the injunction to require disclosure of warrant-based arrests documents is beyond the scope of this lawsuit and the Court's preliminary injunction. Tr. 259, 264, 274. Defendants relied on *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 175 F.4th 828 (7th Cir. 2026), to argue that the Court cannot modify its order to permit disclosure of warrant-based arrest documents. Tr. 254-55. As the Seventh Circuit explained in *Castañon-Nava*, 8 U.S.C. § 1252(f)(1) "bars an inferior court from issuing classwide injunctive relief that would interfere with ICE's operation of [8 U.S.C] § 1226, even if the court believes the manner in which the government exercised its authority under the

provision…is unlawful." 175 F.4th at 839 (citing *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550-51 (2022)).

However, the *Castañon-Nava* Court dealt with a very different district court order. The district court had concluded that ICE's practice of issuing field warrants exceeded its statutory authority, and far beyond document disclosure, the district court ordered classwide relief by releasing individuals arrested pursuant to invalid I-200 field warrants. The Seventh Circuit reversed that order, concluding it ran afoul of § 1252(f)(1). *Castañon-Nava*, 161 F.4th at 857.

This Court is not modifying its injunction in any way that improperly interferes with ICE's operation of executing lawful warrant-based arrests under § 1226. The Court has serious concerns about the lawfulness of the field warrant process presented by Defendants in this case. However, the Court ultimately finds, based on the testimony of arrested individuals, that H-D-G-H-, J-C-C-V-, and H-F-M-J- were not arrested pursuant to lawful warrants at all. Moreover, other district courts have agreed that disclosure of supposedly warrant-based arrest documents is appropriate when evidence demonstrates that ICE officers erroneously claim to have lawful warrants. *See, e.g.*, *Ovando v. Mullin*, No. 1:25-cv-03183-RBJ, 2026 U.S. Dist. LEXIS 203717, at *60-62 (D. Colo. May 12, 2026) (enforcing preliminary injunction by requiring ICE defendants to disclose I-213s and associated administrative warrants for "arrests in which the government claims they obtained a warrant after the encounter began"). Nothing in the Court's modified order would improperly "add[] a new procedural step to the Government's operation" of conducting warrant-based arrests. *Al Otro Lado v. Exec. Office for Immigr. Review*, 138 F.4th 1102, 1125 (9th Cir. 2025) (citing *Aleman Gonzalez*, 596 U.S. at 551), *rev'd on other grounds sub nom. Mullin v. Al Otro Lado*, 146 S. Ct. 2079 (U.S. 2026).

It is not lost on this Court that Defendants have attempted an end-run around compliance with both the law and the preliminary injunction. What they claim to be warrant-based arrests in this record are simply not. And no amount of insistence or table-pounding will make them so. Defendants, through their own conduct, have lost trust. Both warrant-based and warrantless arrests documents are now subject to this preliminary injunction, because Plaintiffs have shown that many of Defendants' warrant-based arrests are in fact warrantless.

To further the purpose of the Court's preliminary injunction order, Defendants must disclose documents and body worn camera footage related to all civil immigration arrests in Oregon. Plaintiffs have demonstrated that I-213s alone do not accurately reflect the factual circumstances of warrantless arrests and that Defendants fail to properly disclose warrantless arrests documents.

**E. Producing All Arrest Documents for Individual Good-Faith Requests**

Finally, Plaintiffs request that Defendants provide all the same documentation described above within seven days of Plaintiffs' good-faith request for information under the terms of the injunction, "regardless of Defendants' position on whether or not the arrest was warrantless." Pls.' Proposed Relief at 4, ECF No. 161. For the same reasons that justify disclosure of all arrest documentation, the Court agrees that relief is appropriate. Defendants in this case have demonstrated that they have not adequately documented or disclosed warrantless arrests in this District, and when Plaintiffs make a good-faith request for documents believed to be related to a warrantless civil immigration arrest, Defendants must disclose those documents.

## CONCLUSION

The Court reviewed the evidence presented in pre-hearing filings, post-hearing filings, and testimony, to determine whether its preliminary injunction required enforcement. Plaintiffs presented copious evidence of Defendants' violations in Oregon. Defendants conducted

warrantless arrests without adequately making pre-arrest probable cause findings of escape risk. Documents failed to provide specific and individualized facts for probable cause. Errors in Defendants' documentation range from typos to outright fabrications. Indeed, the sole ICE officer who testified admitted to falsely stating facts in official agency documentation about the basis for an arrest. There is no telling how many other agents in Oregon engaged in similar misconduct, which calls into question the veracity of all I-213 forms completed by ICE officers in Oregon. Based solely on the evidence presented in this case, Defendants have clearly violated the Court's preliminary injunction order.

However, ICE does not act in Oregon alone, and its officers' poor track record of documenting arrests spans the nation. Courts across the country have noted errors and falsehoods in ICE documentation. *See, e.g.*, *Souza v. Wesling*, No. 26-13761-BEM, 2026 U.S. Dist. LEXIS 205648, at *11, *15 (D. Mass. Sept. 11, 2026) (noting that "after repeated misrepresentations by ICE officers, both to this Court and others, the inherent trustworthiness of Form I-213s and other like documents is, at best, on perilous footing" and concluding that "it is with profound regret that this Court no longer applies the presumption of regularity to ICE"); *Almonte v. Genalo*, No. 26-3633, 2026 U.S. Dist. LEXIS 228201, at *25 (E.D.N.Y. Oct. 5, 2026) (describing how, in at least one case, "ICE agents prepared a substantially false administrative warrant in an attempt to rationalize their actions" when arresting an individual).

Moreover, this Court is far from the only district court finding it necessary to enforce or modify its prior orders against ICE officials in light of repeated violations. *See, e.g.*, *Castañon-Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823 (N.D. Ill. 2025), *aff'd in part*, 175 F.4th 828 (7th Cir. 2026); *Ovando v. Mullin*, No. 1:25-cv-03183-RBJ, 2026 U.S. Dist. LEXIS 203717

(D. Colo. May 12, 2026); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 832 F. Supp. 3d 22 (D.D.C. 2026); *United Farm Workers v. Noem*, 829 F. Supp. 3d 801 (E.D. Cal. 2026).

The presumption of regularity directs the courts to assume, unless clear evidence indicates differently, that government officials have properly discharged their duties, acted in good faith and followed required procedures. This presumption no longer holds for Defendants. The evidence in this case proves as much. Defendants are held to the same expectation as any other litigant before this Court. One must earn credibility by acting with integrity.

Until that credibility is earned, it is hereby ORDERED [18]:

1. Defendants have a continuing obligation to transmit the terms of the preliminary injunction order to their officers, employees, and contractors who have responsibilities related to its contents. Defendants SHALL transmit the terms of the order every thirty days to ensure that their officers, employees, and contractors are aware of and complying with the terms of the order. Defendants SHALL certify this retransmission every thirty days by filing notice with the Court.

2. Defendants SHALL re-produce all past documentation to Plaintiffs without redaction and SHALL continue to produce all documentation to Plaintiffs without redaction.

[18] To the extent that any information included in this Court's Opinion falls within the Court's previously issued protective order (ECF No. 42), the Court *sua sponte* modifies the protective order to allow the publication of this information in the interests of justice, in order to protect the public's interest in this information and ensure a robust discussion of the facts. District courts retain discretion to decide whether to modify protective orders. *See Empire Blue Cross & Blue Shield v. Janet Greeson's A Place For Us, Inc.*, 62 F.3d 1217, 1219 (9th Cir. 1995). Here, the Court issued a stipulated blanket protective order that remains in place, but the Court finds that no particularized harm will result from the disclosure of the limited, anonymized information included in this Opinion. The underlying documents containing the quoted information remain confidential and under seal, but the public's interest in the information disclosed in this Opinion far outweighs any possibility of harm to the parties. *See Phillips v. General Motors Corp.*, 289 F.3d 1117, 1121, 1123 (9th Cir. 2002) (requiring courts to "balance[] the public and private interests to decide whether a protective order is necessary" and conduct a "good cause" analysis for particularized harm caused by disclosure).

3. Defendants, for the purposes of compliance reporting, SHALL produce, for every reporting period since the injunction was effective, all documents related to an arrest made by Defendants, including the corresponding Forms I-200, I-213, all documents served on the arrested individual, and any evidence underlying the I-200 as described in the I-213 or referred to by the I-200 form itself, or affirmatively state under oath that no such additional documentation exists.

4. Defendants, for the purposes of compliance reporting, SHALL produce, for all arrests on or after September 1, 2026, all body worn camera footage of the arrest, or affirmatively state under oath that no such body worn camera footage exists.

5. Defendants, for the purposes of compliance reporting, SHALL produce, for all inquiries made in good faith by Plaintiffs pursuant to the terms of the injunction, all documents related to an arrest made by Defendants, including the corresponding Forms I-200, I-213, all documents served on the arrested individual, any evidence underlying the I-200 as described in the I-213 or referred to by the I-200 form itself, and any body worn camera footage, or affirmatively state under oath that no such additional documentation exists, within seven days of request.

DATED this 2nd day of November 2026.

MUSTAFA T. KASUBHAI (he/him)
United States District Judge